John D. Gaither, Tex. Bar No. 24055516
Samantha Espino, Tex. Bar No. 24131801
**Wick Phillips Gould & Martin, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Phone: (214) 692-6200
john.gaither@wickphillips.com
samantha.espino@wickphillips.com

**Counsel for Hartman vREIT XXI, Inc.
and Al Hartman**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:**<br><br>**Silver Star Virginia Parkway LLC, *et al.***<br><br>**Debtors.**[1] | §<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 26-42315-mxm11**<br><br>**(Jointly Administered)** |

# DISCLOSURE STATEMENT FOR HARTMAN PARTIES' CHAPTER 11 PLAN OF LIQUIDATION FOR DEBTOR SILVER STAR PROPERTIES REIT, INC.

John D. Gaither, Tex. Bar No. 24055516
Samantha Espino, Tex. Bar No. 24131801
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Phone: (214) 692-6200
john.gaither@wickphillips.com
samantha.espino@wickphillips.com

**COUNSEL FOR HARTMAN vREIT XXI, INC.
AND AL HARTMAN, PLAN PROPONENTS**

[1] The Debtors in these proceedings (including their respective taxpayer identification numbers) are: Silver Star Virginia Parkway LLC (99-3308488); Silver Star Properties REIT, Inc. (26-3455189); and Cooper Street SPE LLC (93-4893154). The Debtors' corporate headquarters are: 100 N. Forest Park Blvd., Suite 100, Fort Worth, TX 76102.

## TABLE OF CONTENTS

**EXHIBITS** .................... i

**I. IMPORTANT NOTICE** .................... 1

**II. INTRODUCTION** .................... 2

**A. Overview of the Plan** .................... 2

**B. Summary of Classification, Treatment, and Estimated Recoveries** .................... 3

**C. Voting Recommendation** .................... 4

**III. VOTING AND CONFIRMATION PROCEDURES** .................... 4

**A. Disclosure Statement Order** .................... 4

**B. Holders Entitled to Vote** .................... 4

**C. Voting Deadline and Ballot Instructions** .................... 5

**D. Confirmation Hearing and Objection Deadline** .................... 5

**IV. BACKGROUND** .................... 5

**A. The Debtor and Its Business** .................... 5

**B. Corporate Structure; Downstream Entities and Non-Plan Debtors** .................... 5

**C. Management and Governance** .................... 6

**D. Assets of the Debtor** .................... 6

**E. Prepetition Asset Sales and Inconsistent Financial Reporting** .................... 6

**F. Prepetition Capital Structure and Asserted Claims** .................... 7

**1. Harris County Tax Claim** .................... 7

**2. First Insurance Secured Claim** .................... 7

**3. Guaranty Claims** .................... 8

**4. General Unsecured Claims** .................... 8

**5. Equity Interests** .................... 9

G. The Plan Proponents ........ 9

H. The Prepetition Litigation and the Liquidation Order ........ 9

1. The Liquidation Order ........ 9

2. The Rights Plan and the Appellate Opinion ........ 10

3. The Proposed "NewCo" Transaction ........ 10

I. Events Leading to the Chapter 11 Filing ........ 10

V. THE CHAPTER 11 CASE ........ 10

A. Commencement of the Case and Joint Administration ........ 10

B. First Day Relief and Retention of Professionals ........ 11

C. Schedules, Statements, Meeting of Creditors, and Bar Dates ........ 11

D. Motion for Relief from the Automatic Stay ........ 11

E. Motion for Rule 2004 Examinations ........ 11

F. Removal of the Texas Case ........ 12

G. Expiration of Exclusivity ........ 12

H. Other Significant Motions and Contested Matters ........ 12

VI. SUMMARY OF THE PLAN ........ 13

A. Unclassified Claims ........ 13

B. Classification and Treatment of Claims and Equity Interests ........ 13

1. Treatment of Guaranty Claims ........ 13

2. The Distribution Waterfall ........ 14

C. Means for Implementation of the Plan ........ 15

D. The Plan Administrator and Oversight Committee ........ 15

E. Liquidation of Downstream Entities and Downstream Assets ........ 15

F. Preservation of Causes of Action ........ 16

G. Executory Contracts and Unexpired Leases ........ 16

**H. Distributions .......... 16**

**I. Procedures for Resolving Disputed Claims .......... 16**

**J. Effect of Confirmation; No Discharge; Injunction .......... 17**

**K. Conditions Precedent to the Effective Date .......... 17**

**L. Modification, Revocation, and Retention of Jurisdiction .......... 17**

**M. Plan Supplement .......... 17**

**VII. CONFIRMATION REQUIREMENTS .......... 17**

**A. Requirements of Section 1129(a) .......... 17**

**B. Best Interests Test; Liquidation Analysis .......... 18**

**C. Feasibility .......... 18**

**D. Acceptance by Impaired Classes .......... 18**

**E. Confirmation Without Acceptance by All Impaired Classes (Cramdown) .......... 19**

**VIII. RISK FACTORS .......... 19**

**A. Bankruptcy Law Considerations .......... 19**

**B. Risks Related to Asset Values and the Liquidation .......... 20**

**C. Risks Related to Claims Estimates, Guaranty Claims, and Recoveries .......... 20**

**D. Risks Related to the Exit Facility and Funding .......... 20**

**E. Risks Related to the Downstream Entities and Non-Plan Debtors .......... 20**

**F. Risks Related to the Maryland Litigation and Causes of Action .......... 21**

**G. Other Risks .......... 21**

**IX. ALTERNATIVES TO CONFIRMATION OF THE PLAN .......... 21**

**A. Liquidation Under Chapter 7 .......... 21**

**B. Dismissal of the Case .......... 21**

**C. Alternative Chapter 11 Plan .......... 22**

**X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES .......... 22**

**A. Tax Consequences to the Debtor (including REIT Status) ... 22**

**B. Tax Consequences to Holders of Claims ... 22**

**C. Tax Consequences to Holders of Equity Interests ... 23**

**D. Information Reporting and Withholding ... 23**

**XI. SECURITIES LAW MATTERS ... 23**

**A. Cancellation of Equity Interests ... 23**

**B. No Issuance of Securities ... 23**

**C. Closing of Transfer Books; No Trading Market ... 23**

**D. Exchange Act Reporting and Deregistration ... 24**

**E. No SEC Approval ... 24**

**XII. CONCLUSION AND RECOMMENDATION ... 24**

## EXHIBITS

**Exhibit A** – Plan

**Exhibit B** – Disclosure Statement Order [to be filed]

**Exhibit C** – Organizational Chart [to be filed]

# I. IMPORTANT NOTICE

**THIS DISCLOSURE STATEMENT IS PRELIMINARY AND IS BEING FILED CONTEMPORANEOUSLY WITH THE PLAN TO DESCRIBE THE PLAN PROPONENTS' PRESENTLY CONTEMPLATED LIQUIDATION FRAMEWORK BASED ON THE INFORMATION REASONABLY AVAILABLE TO THEM. THE PLAN PROPONENTS DO NOT PRESENTLY HAVE COMPLETE ACCESS TO THE BOOKS, RECORDS, FINANCIAL INFORMATION, VALUATIONS, CLAIMS INFORMATION, AND OTHER INFORMATION CONCERNING THE DEBTOR AND ITS DIRECT AND INDIRECT SUBSIDIARIES THAT IS NECESSARY TO COMPLETE CERTAIN DISCLOSURES, ESTIMATES, PROJECTIONS, AND ANALYSES CONTAINED OR REFERENCED HEREIN. THE PLAN PROPONENTS ARE PURSUING DISCOVERY OF SUCH INFORMATION AND INTEND TO AMEND AND SUPPLEMENT THIS DISCLOSURE STATEMENT, AND MAY AMEND THE PLAN, BASED ON THE INFORMATION OBTAINED THROUGH THAT PROCESS. ANY SUCH AMENDMENTS MAY BE MATERIAL.**

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT.**

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL GOVERN.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, AND NOTHING HEREIN SHALL BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED. NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY DISTRIBUTION UNDER THE PLAN SHALL CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE HEREOF.**

**THE PLAN PROPONENTS ARE NOT THE DEBTOR AND DO NOT CONTROL THE DEBTOR'S BOOKS AND RECORDS. CERTAIN INFORMATION IN THIS DISCLOSURE STATEMENT HAS BEEN DERIVED FROM THE DEBTOR'S**

**SCHEDULES, STATEMENTS, PROOFS OF CLAIM, AND OTHER PUBLIC FILINGS AND HAS NOT BEEN INDEPENDENTLY VERIFIED.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES REGULATOR.**

**HOLDERS SHOULD CONSULT THEIR OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

## II. INTRODUCTION

Hartman vREIT XXI, Inc. and Al Hartman, creditors, shareholders, and parties in interest (collectively, the "Plan Proponents"), submit this disclosure statement (as may be amended, supplemented, or modified, this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Hartman Parties' Chapter 11 Plan of Liquidation for Debtor Silver Star Properties REIT, Inc. filed contemporaneously herewith (as may be amended, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**. Capitalized terms used but not defined herein have the meanings given to them in the Plan.

Silver Star Properties REIT, Inc. (the "Debtor") filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on May 28, 2026 (the "Petition Date") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"), commencing the case styled *In re Silver Star Properties REIT, Inc.*, Case No. 26-42316 (the "Case"). For administrative convenience and efficiency, the Case is jointly administered under Case No. 26-42315-mxm11 with the bankruptcy cases of Silver Star Virginia Parkway LLC and Cooper Street SPE LLC (together with any other jointly administered debtor other than the Debtor, the "Non-Plan Debtors"). The Plan is filed only for the Debtor and only provides treatment for Classes of Claims against, and Interests in, the Debtor.

The exclusivity period during which the Debtor had the exclusive right to file a chapter 11 plan expired on September 25, 2026, without the Debtor having filed a plan. The Plan Proponents thereafter filed the Plan.

### A. Overview of the Plan

The Plan provides for the orderly liquidation of the Debtor in accordance with its corporate charter and the orders entered in the Maryland Litigation. On the Effective Date, the Debtor's existing management will be removed and replaced by a Plan Administrator, an independent fiduciary who will oversee the orderly wind-down and liquidation of the Debtor, together with the Downstream Entities and Downstream Assets, subject to consultation with and periodic reporting to an Oversight Committee.

Distributions under the Plan will be funded with (i) Cash on hand on the Effective Date; (ii) an Exit Facility of up to [$______] to be provided by one or more of the Plan Proponents or their designated affiliate; (iii) proceeds from the sale of the North Freeway Property; (iv) the

Residual Proceeds received from the Downstream Entities and Downstream Assets; and (v) the proceeds of Causes of Action.

After payment of or reserves for senior Claims and the costs of administering the Plan, net proceeds of the orderly liquidation will be pooled in the Residual Recovery Pool for Pro Rata distribution to Holders of Allowed Remaining Guaranty Claims (Classes 3, 4, and 5) and Allowed General Unsecured Claims (Class 6). Holders of Allowed Equity Interests (Class 7) will receive a Pro Rata Share of any value remaining after all Allowed Claims and all costs of the Plan Administrator and wind-down are paid in full. Because the Debtor is liquidating, the Debtor will not receive a discharge.

The Plan Proponents strongly believe that the Plan presents the best opportunity to maximize the value of the Debtor's estate, including its interests in the Downstream Entities. The Debtor's Existing Management has spent years embroiled in costly, unsuccessful litigation and is operating the Debtor in contravention of both its corporate charter and the orders entered in the Maryland Litigation, each of which require the Debtor to be liquidated for the benefit of creditors and shareholders. The appointment of an independent Plan Administrator to oversee the orderly winddown and liquidation of the Debtor is intended to preserve asset values and maximize recoveries, and the Plan Proponents encourage each Holder of an Allowed Claim or Equity Interest to vote to accept the Plan.

## B. Summary of Classification, Treatment, and Estimated Recoveries

The following table summarizes the classification of Claims and Equity Interests under the Plan. The estimated amounts and recoveries set forth below are estimates only and are subject to change.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Harris County Tax Claims | Unimpaired | Presumed to Accept |
| 2 | First Insurance Secured Claim | Unimpaired | Presumed to Accept |
| 3 | HSRE Guaranty Claim | Impaired | Entitled to Vote |
| 4 | Greyhawk Guaranty Claim | Impaired | Entitled to Vote |
| 5 | Wells Fargo Guaranty Claim | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Equity Interests | Impaired | Entitled to Vote |

**Class 1 – Harris County Tax Claim.** Unless otherwise agreed, regular installment payments satisfying section 1129(a)(9)(D) of the Bankruptcy Code, with interest as required by section 511. The Holder retains its Lien until paid in full. Estimated amount: $22,416.24. Estimated recovery: 100%.

**Class 2 – First Insurance Secured Claim.** Bifurcated under section 506(a) of the Bankruptcy Code. At the Plan Administrator's election, Cash equal to the Allowed Secured Amount or return of the collateral, with Lien retained until satisfied; any deficiency is treated in Class 6. Estimated amount: $185,427.27. Estimated recovery: [___%].

**Class 3 – HSRE Guaranty Claim.** Treatment of its Remaining Guaranty Claim under the Treatment of Guaranty Claims provisions (Pro Rata Share of the Residual Recovery Pool on account of its Remaining Guaranty Claim after first looking to the borrower, HSRE Collateral, and other Primary Recovery Sources). Estimated amount: $17,000,000.00. Estimated recovery: [___%].

**Class 4 – Greyhawk Guaranty Claim.** Treatment of its Remaining Guaranty Claim under the Treatment of Guaranty Claims provisions (Pro Rata Share of the Residual Recovery Pool on account of its Remaining Guaranty Claim after first looking to the borrowers, Greyhawk Collateral, and other Primary Recovery Sources). Estimated amount: $24,517,611.69. Estimated recovery: [___%].

**Class 5 – Wells Fargo Guaranty Claim.** Treatment of its Remaining Guaranty Claim under the Treatment of Guaranty Claims provisions (Pro Rata Share of the Residual Recovery Pool on account of its Remaining Guaranty Claim after first looking to the borrower, Wells Fargo Collateral, and other Primary Recovery Sources). Estimated amount: $10,538,527.02. Estimated recovery: [___%].

**Class 6 – General Unsecured Claims.** Pro Rata Share of the Residual Recovery Pool. Estimated amount: [$_______]. Estimated recovery: [___%].

**Class 7 – Equity Interests.** Existing Equity Interests cancelled on the Effective Date; Pro Rata Share of the Equity Distribution Pool, if any. Estimated amount: [$_______]. Estimated recovery: [___%].

## C. Voting Recommendation

The Plan Proponents believe that the Plan provides for an orderly, value-maximizing liquidation under independent management and the greatest recoveries available to Holders of Claims and Equity Interests, and recommend that all Holders entitled to vote cast their ballots to **ACCEPT** the Plan.

# III. VOTING AND CONFIRMATION PROCEDURES

## A. Disclosure Statement Order

[On [_______], 2026, the Bankruptcy Court entered an order [ECF ___] (the "Disclosure Statement Order") approving this Disclosure Statement as containing adequate information and establishing procedures for the solicitation and tabulation of votes.]

## B. Holders Entitled to Vote

Holders of Claims and Equity Interests in Classes 3, 4, 5, 6, and 7 are Impaired and entitled to vote on the Plan. Holders of Claims in Classes 1 and 2 are Unimpaired, are presumed to accept the Plan, and are not entitled to vote. Only Holders as of [_______], 2026, (the "Voting Record Date") are entitled to vote.

Under the Plan, any Class that has no Holder of an Allowed Claim or Allowed Equity Interest (or a Claim or Interest temporarily Allowed) as of the Confirmation Hearing will be deemed eliminated for voting purposes, and if no Holder in a Class eligible to vote votes to accept or reject the Plan, the Plan will be presumed accepted by that Class.

### C. Voting Deadline and Ballot Instructions

To be counted, ballots must be properly completed, executed, and actually received by the Plan Proponents via email at [______] no later than [__:__ _.m.] (prevailing Central Time) on [_______], 2026 (the "Voting Deadline").

### D. Confirmation Hearing and Objection Deadline

The Confirmation Hearing will be held before the Honorable Mark X. Mullin, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, 501 West 10th Street, Fort Worth, Texas 76102, on [_______], 2026 at [__:__ _.m.] (prevailing Central Time). Objections to Confirmation must be Filed and served no later than [_______], 2026 at [__:__ _.m.] (prevailing Central Time).

## IV. BACKGROUND

### A. The Debtor and Its Business

The Debtor, formerly known as Hartman Short Term Income Properties XX, Inc., is a public, non-traded real estate investment trust organized under the laws of the State of Maryland, with its corporate headquarters at 100 N. Forest Park Blvd., Suite 100, Fort Worth, Texas 76102. The Debtor holds its material assets through various subsidiaries, referred to in the Plan as the Downstream Entities. The Debtor was founded and formerly managed by Al Hartman, who departed in 2022. Historically, the Debtor invested in commercial office, retail, and light-industrial properties. In 2023, after Mr. Hartman was no longer involved in the Debtor's management, the Debtor's Executive Committee approved a plan to reposition the Debtor's assets away from office, retail, and light-industrial properties and into self-storage. The Plan Proponents contend that this ill-advised transition caused significant damage to the Debtor's business and enterprise value and ultimately led to its bankruptcy.

As a public reporting company, the Debtor is required to file annual, quarterly, and current reports and proxy statements with the Securities and Exchange Commission (the "SEC"). However, the Debtor, under the control of Existing Management, has not complied with its SEC reporting obligations, limiting the amount of publicly available information concerning the Debtor and its operations.

### B. Corporate Structure; Downstream Entities and Non-Plan Debtors

The Debtor holds direct or indirect interests in the Downstream Entities, which own or hold the Downstream Assets, which include real property and claims and causes of action. Two of the Downstream Entities, Silver Star Virginia Parkway LLC and Cooper Street SPE LLC, are also debtors in the jointly administered Chapter 11 Cases but are not Plan debtors. Non-Plan Debtors Silver Star Virginia Parkway LLC owns and operates a self-storage facility at 2870 Virginia

Parkway, McKinney, Texas, and Cooper Street SPE LLC owns two self-storage facilities in Houston, Texas, known as Advantage Storage Kirby and Advantage Storage Wesleyan. An organizational chart reflecting the Debtor's description of the Downstream Entities, as attached to the Debtor's petition, is attached hereto as Exhibit [___].

**C. Management and Governance**

Gerald Haddock serves as the Debtor's Chief Executive Officer and signed the Debtor's petition and Schedules. Louis Fox serves as the Debtor's Chief Financial Officer and has signed the Debtor's monthly operating reports. David Wheeler serves as the Debtor's Chief Operating Officer and Treasurer. Mr. Haddock, James Still, and Jack Tompkins comprise the Executive Committee of the Debtor's board of directors.

**D. Assets of the Debtor**

The Debtor's scheduled assets include (i) its interests in the Downstream Entities; (ii) the North Freeway Property; and (iii) Causes of Action, including potential Causes of Action against the Existing Management. Because of the Debtor's failure to complete audits, failure to comply with SEC reporting obligations, and failure to comply with reporting requirements under the Bankruptcy Code, including the reports required under Bankruptcy Rule 2015.3, the Plan Proponents lack reliable information concerning the value of the Debtor's assets.

However, the Debtor scheduled the North Freeway Property at a value of $1,500,000.00, and has reported approximately $14,000,000.00 in equity in the real property owned by Cooper Street SPE LLC, a wholly-owned indirect subsidiary of the Debtor, indicating the Debtor's belief that there is significant equity value available for distribution to creditors. Cooper Street SPE LLC's July 2026 monthly operating report reflects total assets of $31,334,524, total liabilities of $18,331,207, and equity of $13,003,317. The Debtor's own monthly operating reports reflect no receipts since the Petition Date and a cash balance that declined from $28,588 at the Petition Date to $21,726 as of July 31, 2026.

The Plan Proponents are informed and believe that the Debtor's primary assets, other than Causes of Action, consist of its indirect interests in (i) the self-storage properties owned by Non-Plan Debtor Cooper Street SPE LLC, acquired in December 2023 for $31,000,000; (ii) the self-storage property owned by Non-Plan Debtor Silver Star Virginia Parkway LLC, acquired in 2024 for $9,750,000.00; (iii) the self-storage property in Delray Beach, Florida owned by Silver Star Delray LLC, acquired in July 2024 for $26,500,000.00; and (iv) certain leasehold interests related to Walgreens locations, acquired in 2024 for $60,925,000.00 and held by the non-debtor entities identified on the "Walgreens Chart" contained in Exhibit [___] (the "Walgreens Entities").

**E. Prepetition Asset Sales and Inconsistent Financial Reporting**

The Debtor has not filed any annual report on Form 10-K or quarterly report on Form 10-Q with the SEC since its quarterly report filed on November 20, 2023, covering the third quarter of 2023. Louis Fox testified at the meeting of creditors held under section 341 of the Bankruptcy Code that the Debtor has not had audited financial statements for several years. As a result, there has been no accurate accounting or public reporting of the Debtor's operations, assets, or liabilities since at least October 1, 2023.

Based on information assembled by the Plan Proponents, the Debtor, through its subsidiaries, sold approximately $395 million in real property between 2023 and 2025, with no accounting of the sources and uses of the sale proceeds and no distributions to shareholders. The Debtor's own reported figures have since shifted dramatically:

(a) In its Definitive Proxy Statement filed with the SEC on May 29, 2025, the Debtor reported, as of April 30, 2025, and on a net realizable value basis, total assets of $183.102 million and total liabilities of $132.130 million, implying net equity of approximately $50.972 million.

(b) At an October 2025, shareholder meeting, the Debtor presented a pro forma balance sheet reporting, as of September 30, 2025, and on a net realizable value basis, total assets of $156.217 million and total liabilities of $118.466 million, implying net equity of approximately $37.751 million.

(c) In the Schedules, the Debtor listed only approximately $1.554 million in total assets and almost $75 million in total liabilities, for negative net equity of approximately $73.442 million — a reduction of almost 99.5% of reported assets since September 30, 2025.

(d) On June 8, 2026, eleven days after the Petition Date, the Debtor filed a Form 8-K with the SEC (Exhibit 99.1) asserting over $100 million in assets, $75 million in liabilities, and net equity of $24 million — directly contradicting the Schedules.

Neither the Schedules nor the Debtor's other filings explain the apparent loss of approximately $154.663 million in assets against a reduction in liabilities of only $43.466 million over such a short period. The Plan Proponents believe these discrepancies warrant independent investigation, which the Plan Administrator will be empowered to undertake.

## F. Prepetition Capital Structure and Asserted Claims

The Debtor's primary debt consists of unsecured guaranty debt related to primary obligations owed by the Downstream Entities, including the HSRE Guaranty Claim, the Greyhawk Guaranty Claim, and the Wells Fargo Guaranty Claim. The Debtor also owes trade debt incurred in the operation of its business and unsecured loan debt to Hartman vREIT XXI, Inc. The Debtor's secured and unsecured indebtedness is summarized below.

### 1. Harris County Tax Claim

Harris County, Texas, or other taxing units acting through the Harris County Tax Assessor-Collector, assert a Claim for ad valorem taxes assessed against the North Freeway Property, which Claim is asserted to be secured by a Lien on the North Freeway Property. The asserted amount of the Harris County Tax Claim is $22,416.24.

### 2. First Insurance Secured Claim

First Insurance Funding, a division of Lake Forest Bank & Trust Company, N.A. ("FIF"), asserts a Secured Claim against the Debtor under a Commercial Premium Finance Agreement (the "Premium Finance Agreement") related to the Debtor's Executive Risk Policy (the "Policy"), which includes the Debtor's directors and officers liability coverage, and FIF has asserted a

security interest thereunder in the Policy, including earned and unearned premiums, and related collateral. The Premium Finance Agreement financed $524,450.00 in premium, taxes, and fees for the extension of the Policy through November 30, 2026. The asserted amount of the First Insurance Secured Claim is $185,427.27. The Debtor scheduled the Claim as unsecured in an unknown amount. On August 7, 2026, the Bankruptcy Court authorized the Debtor to borrow up to $100,000.00 from its indirect subsidiary, Silver Star Property Management, Inc., to cure a $93,856.29 delinquency under the Premium Finance Agreement (see Section V.H below).

**3. Guaranty Claims**

Three lenders assert Claims against the Debtor arising from the Debtor's guaranty of obligations of affiliated borrowers (collectively, the "Guaranty Claims"):

(a) **HSRE Guaranty Claim**. The HSRE Guaranty Claim is an unsecured claim by HSRE-ADV VII, LLC ("HSRE") in connection with the primary obligation of Cooper Street SPE, LLC. The debt underlying the HSRE Guaranty Claim is a $17,000,000.00 loan made on December 21, 2023 to finance Cooper Street SPE LLC's $31,000,000.00 acquisition of the Kirby and Wesleyan self-storage facilities, maturing December 21, 2026. The loan is allegedly secured by a deed of trust on those properties, an all-asset lien, and a pledge of the membership interests in Cooper Street SPE LLC. HSRE asserts that Cooper Street SPE LLC defaulted by, among other things, failing to pay real estate taxes, and holds an April 29, 2025 agreement for a deed in lieu of foreclosure. The asserted amount of the HSRE Guaranty Claim is $17,000,000.00.

(b) **Greyhawk Guaranty Claim**. The Greyhawk Guaranty Claim is an unsecured claim asserted by Greyhawk Silver Star, LLC in connection with the primary obligations of the Walgreens Entities. The debt underlying the Greyhawk Guaranty Claim is allegedly secured by the assets of the Walgreens Entities, which consist of real properties leased for the operation of Walgreens locations. The asserted amount of the Greyhawk Guaranty Claim is $24,517,611.69.

(c) **Wells Fargo Guaranty Claim**. The Wells Fargo Guaranty Claim is an unsecured claim asserted by Wells Fargo Bank, National Association, as Trustee for the Benefit of the Holders of Benchmark 2019-B10 Mortgage Trust Commercial Mortgage Pass Through Certificates, Series 2019-B10, in connection with the primary obligation of Hartman Retail III, DST. The debt underlying the Wells Fargo Guaranty Claim is allegedly secured by the assets of the Hartman Retail III, DST, a non-debtor entity that is not a Downstream Entity, which consist of the commercial real property located at 5651 SH 121, The Colony, Texas 75056. The asserted amount of the Wells Fargo Guaranty Claim is $10,538,527.02.

**4. General Unsecured Claims**

The Debtor scheduled total unsecured claims of $74,973,657.04, which include the scheduled amounts of the Guaranty Claims described above. Other significant scheduled unsecured claims include a $15,530,000.00 claim of FBRED BDC Finance LLC, $1,000,000.00 "stock purchase" claims of each of Louis Fox, Mark Torok, and Michaeljohn Kudlik, and claims of numerous law firms and other professionals, including Saul Ewing, LLP ($1,205,443.29). The Plan Proponents and their affiliates have filed Proofs of Claim described in Section IV.G below.

### 5. Equity Interests

The Debtor is a publicly traded real estate investment trust that reported 67,425,433 shares of common stock outstanding as of May 21, 2025. Proportionate ownership of the Debtor's common stock is affected by the Appellate Opinion described in Section IV.H.2. Under the Plan, Pro Rata Shares of the Equity Distribution Pool will be determined in accordance with the Debtor's books and records, taking into account the results of the Maryland Litigation.

## G. The Plan Proponents

Hartman vREIT XXI, Inc. is an unsecured creditor of the Debtor, including on account of an unsecured loan extended to the Debtor, and, upon information and belief, is one of the largest equity security holders of the Debtor. Its chief executive officer, Al Hartman, is a creditor, a current director, and the largest equity security holder of the Debtor. Mr. Hartman previously served as the Debtor's Chairman of the Board, President, and Chief Executive Officer until 2022. Hartman vREIT XXI, Inc. filed a Proof of Claim asserting, as of the Petition Date, $15,335,940 in principal under promissory note, plus $5,159,110 in interest, plus additional liquidating and unliquidated amounts. Al Hartman filed a Proof of Claim asserting claims for unpaid compensation and unreimbursed expenses. Parties affiliated with the Plan Proponents, including the Hartman Family Protection Trust and Hartman XX Holdings, Inc., have also filed Proofs of Claim or Interest.

## H. The Prepetition Litigation and the Liquidation Order

Since 2023, the Plan Proponents and the Debtor have been engaged in litigation in Maryland and Texas state courts arising from a proxy dispute over the direction and control of the Debtor. The disputes concern, among other things, the unpaid loan extended by Hartman vREIT XXI, Inc. to the Debtor, breach of contract claims, relief to compel the Debtor to hold its annual meeting so as to prevent the liquidation otherwise required by its charter, and relief to enjoin the improper dilution of the shares held by the Plan Proponents and their affiliates. The litigation includes Case No. 24-C-23-003722, *Allen R. Hartman, et al. v. Silver Star Properties REIT, Inc., et al.*, in the Circuit Court for Baltimore City (the "Circuit Case"); Case No. 2441, *Allen R. Hartman v. Silver Star Properties REIT, Inc., et al.*, in the Appellate Court of Maryland (the "Appellate Case" and, with the Circuit Case, the "Maryland Litigation"); and Cause No. 2023-17944, *Allen R. Hartman and Hartman vREIT XXI, Inc. v. Silver Star Properties REIT, Inc., et al.*, in the 133rd Judicial District Court of Harris County, Texas, into which Cause No. 2023-85765 was consolidated (the "Texas Case"), which has now been removed to the Bankruptcy Court and is pending in the Bankruptcy Court under Adv. Pro. No. 26-04125-mxm, *Hartman v. Silver Star Properties REIT, Inc*. (the "Hartman Adversary").

### 1. The Liquidation Order

On February 3, 2025, the Circuit Court for Baltimore City entered an order requiring the Debtor "to proceed with an orderly liquidation of its assets," as required by its corporate charter, if the Debtor did not hold its annual meeting or obtain shareholder approval of a deferral of liquidation by June 21, 2025, a deadline later extended to October 21, 2025 (the "Liquidation Order"). Despite repeated attempts to delay, the Debtor satisfied neither condition by the extended deadline. Accordingly, the Debtor is required to liquidate its assets under both the Liquidation

Order and its own charter. The Plan implements that court-ordered and charter-mandated liquidation.

### 2. The Rights Plan and the Appellate Opinion

Among the issues in the Maryland Litigation was the validity of a stockholder rights plan, or "poison pill," adopted and triggered by the Debtor, which diluted the ownership interests of Al Hartman and certain other stockholders by approximately 50%. On June 26, 2026, the Appellate Court of Maryland issued an opinion reversing and remanding the Circuit Court's ruling (the "Appellate Opinion"). The Appellate Court held that the filing of a civil action by a stockholder to enforce the terms of a corporation's charter, and the reporting of that lawsuit in a Schedule 13D/A filed with the SEC, did not trigger the poison pill, and directed that, on remand, the Circuit Court "take appropriate action to undo the implementation of the Rights Plan." The Appellate Court also confirmed that the liquidation provision of the Debtor's charter is enforceable by any stockholder. Although the Appellate Opinion issued after the Petition Date, the Debtor had not notified either Maryland court of its bankruptcy filing; the Debtor did not file suggestions of bankruptcy in the Maryland Litigation until July 9, 2026. Mr. Hartman took no action in the Maryland Litigation after the Petition Date. As discussed in Section V.D, the Bankruptcy Court has annulled the automatic stay to the extent necessary to give effect to the Appellate Opinion. Under the Plan, Pro Rata Shares of the Equity Distribution Pool will be determined in accordance with the Debtor's books and records taking into account the results of the Maryland Litigation.

### 3. The Proposed "NewCo" Transaction

In a report to shareholders dated April 24, 2026, roughly one month before the Petition Date, the Debtor presented a so-called plan of liquidation that called for the creation of a new entity ("NewCo") to receive the assets of the Debtor and its subsidiaries without paying creditors. The Plan Proponents believe the proposed transaction would have constituted a fraudulent transfer and a breach of fiduciary duties and are proposing the Plan to ensure that the Debtor is liquidated in a manner consistent with the rights and interest of creditors and shareholders.

## I. Events Leading to the Chapter 11 Filing

Following the Debtor's failure to comply with the Liquidation Order, its substantial asset dispositions, the proposed NewCo transaction, and while the Appellate Case remained pending, the Debtor filed its chapter 11 petition on May 28, 2026. The Plan Proponents are informed and believe that the Case was filed to stop foreclosure on certain of the Downstream Assets.

# V. THE CHAPTER 11 CASE

## A. Commencement of the Case and Joint Administration

On May 28, 2026, the Debtor and Silver Star Virginia Parkway LLC each filed voluntary petitions in the Bankruptcy Court, commencing Case Nos. 26-42316 and 26-42315, respectively. On June 4, 2026, the Bankruptcy Court entered an order directing joint administration of those cases under Case No. 26-42315 [ECF No. 21]. Cooper Street SPE LLC filed its voluntary petition on June 22, 2026, commencing Case No. 26-42706, and on June 30, 2026, the Bankruptcy Court entered an order directing joint administration of that case with the other cases [ECF No. 55]. Joint

administration is for procedural purposes only and does not substantively consolidate the estates. No trustee, examiner, or official committee has been appointed.

**B. First Day Relief and Retention of Professionals**

The Debtor is represented by DeMarco•Mitchell, PLLC. The Debtor itself has limited operations, has not sought approval of a budget, and its monthly operating reports reflect no receipts since the Petition Date.

**C. Schedules, Statements, Meeting of Creditors, and Bar Dates**

The Debtor filed its Schedules with its petition [ECF No. 1 in Case No. 26-42316]. The Schedules list total assets of $1,553,588.00, consisting of the North Freeway Property ($1,500,000.00) and two bank accounts and other personal property, and total unsecured claims of $74,973,657.04. The section 341 meeting of creditors was held by telephone on June 26, 2026. At the section 341 meeting, the Debtor's representatives testified that the Debtor has not had audited financial statements for several years. The general bar date for filing proofs of claim or interest by Creditors other than governmental units was September 24, 2026, and the governmental bar date is November 24, 2026.

**D. Motion for Relief from the Automatic Stay**

On July 17, 2026, Al Hartman filed a motion seeking annulment of the automatic stay in the Case, solely to the extent necessary to give legal effect to the Appellate Opinion, while leaving the stay in place for all other purposes relating to the Maryland Litigation [ECF No. 76]. The motion asserted that cause exists because the Debtor failed to notify the Maryland courts of the Case before the Appellate Opinion issued, and because recognizing the Appellate Opinion avoids uncertainty and duplicative litigation without burdening the Estate. The Debtor initially opposed the motion [ECF No. 89]. On August 14, 2026, the Bankruptcy Court entered an agreed order granting the motion and annulling the automatic stay in the Case to the extent necessary to give effect to the Appellate Opinion, provided that any deadlines to appeal the Appellate Opinion that were stayed as of the Petition Date remain stayed until further order [ECF No. 121].

**E. Motion for Rule 2004 Examinations**

On July 17, 2026, Hartman vREIT XXI, Inc. filed a motion under Bankruptcy Rule 2004 seeking the examination of Gerald Haddock, the Debtor's Chief Executive Officer, and a corporate representative of the Debtor, and production of documents concerning, among other things, the Debtor's and its subsidiaries' asset dispositions since January 1, 2023, the sources and uses of sale proceeds, the Debtor's compliance with the Liquidation Order, the April 24, 2026 NewCo proposal, and the discrepancies among the Debtor's proxy financials, shareholder presentations, Schedules, and Form 8-K disclosures [ECF No. 75]. On August 14, 2026, the Bankruptcy Court entered an agreed order authorizing the examination of Louis Fox as the Debtor's corporate representative and requiring the Debtor to produce a first round of documents within 14 days, while reserving disputes regarding further document requests and the examination of Mr. Haddock [ECF No. 122]. Hartman vREIT XXI, Inc. has since moved for supplemental Rule 2004 discovery, asserting that the Debtor has not completed its production or provided dates for Mr. Fox's examination, and seeking to extend discovery to the Debtor's non-debtor subsidiaries.

## F. Removal of the Texas Case

On June 9, 2026, the Debtor filed a suggestion of bankruptcy in the Texas Case. On June 27, 2026, the Plan Proponents and their affiliates filed a notice of removal of the Texas Case to the United States Bankruptcy Court for the Southern District of Texas, Houston Division, commencing Adversary Proceeding No. 26-03245. The Texas Case, now pending as the Hartman Adversary, was transferred to the Bankruptcy Court on September 24, 2026. The Debtor has scheduled its claims in the Texas Case as assets of the Estate, and the Debtor's counterclaims include claims under the Texas Uniform Fraudulent Transfer Act. The Plan Proponents dispute the Debtor's allegations in the Texas Case.

## G. Expiration of Exclusivity

The Debtor's exclusive period to file a chapter 11 plan expired on September 25, 2026, without the Debtor having filed a plan. Nearly four months after the Petition Date, the Debtor has proposed no path to the liquidation required by its charter and the Liquidation Order. The Plan Proponents filed the Plan to fulfill the Debtor's duty to liquidate its assets in an orderly manner for the benefit of creditors and shareholders, and to prevent Existing Management from continuing to operate the Debtor in a manner inconsistent with that duty.

## H. Other Significant Motions and Contested Matters

**Sale of the North Freeway Property.** On June 22, 2026, the Debtor moved to sell the North Freeway Property to Black Eye Properties, LLC for $1,400,000.00 [ECF No. 32]. The Bankruptcy Court granted the motion by order entered July 2, 2026 [ECF No. 60], as described in Section IV.D. Upon information and belief, the sale did not close.

**Insider Financing for D&O Insurance.** On July 30, 2026, the Debtor filed an emergency motion to borrow up to $100,000.00 on an unsecured, administrative-priority basis from its indirect wholly owned subsidiary, Silver Star Property Management, Inc., to cure a $93,856.29 prepetition delinquency owed to FIF and keep in force the directors and officers liability policy covering Existing Management [ECF Nos. 90, 91]. On August 7, 2026, the Bankruptcy Court granted the motion [ECF Nos. 106, 107]. The loan bears interest at 6% and matures 180 days after entry of the order.

**Cooper Street SPE LLC Matters.** On July 8, 2026, HSRE moved to designate the case of Cooper Street SPE LLC as a single asset real estate case [ECF No. 68]. On August 14, 2026, the Bankruptcy Court entered an interim order authorizing Cooper Street SPE LLC to use HSRE's cash collateral, granting HSRE replacement liens, a superpriority claim to the extent of any diminution in value, and monthly adequate protection payments of $175,667 [ECF No. 123].

**BSPRT Lender Litigation.** Before the Petition Date, the Debtor and its subsidiaries Silver Star CRE LLC, Silver Star CRE II LLC, and Silver Star Delray LLC sued BSPRT CRE Finance LLC, FBRED BDC Finance LLC, and BSPRT CS Loan LLC in Texas state court, asserting lender liability and related claims. The action was removed and, on June 22, 2026, the United States District Court for the Northern District of Texas referred it to the Bankruptcy Court, where it is pending as Adversary Proceeding No. 26-04073 (the "<u>BSP Adversary</u>").

## VI. SUMMARY OF THE PLAN

The following is a summary of certain material provisions of the Plan. This summary is qualified in its entirety by reference to the Plan.

### A. Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims are not classified (Plan Article III).

**Administrative Claims.** Unless otherwise agreed, each Holder of an Allowed Administrative Claim (other than fees under 28 U.S.C. § 1930) will receive Cash equal to the Allowed amount (a) on the Effective Date or as soon as practicable thereafter, or (b) if not Allowed by the Effective Date, no later than 30 days after the order Allowing the Claim becomes a Final Order. Estimated amount: [$_______].

**Hartman Substantial Contribution Claim.** The Plan Proponents assert an Administrative Claim under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for actual and necessary expenses and the reasonable compensation and expenses of their professionals in making a substantial contribution in the Case, in the amount approved by the Bankruptcy Court. Unless otherwise agreed, the Allowed amount will be paid in Cash at the closing of the sale of the North Freeway Property, with any unpaid balance paid from the Residual Proceeds. Estimated amount: [$_______].

**Priority Tax Claims.** At the Plan Administrator's election, each Holder will receive (a) Cash equal to the Allowed amount, or (b) regular installment payments in Cash, with interest under section 511 of the Bankruptcy Code, over a period ending not later than five years after the Order for Relief, in compliance with section 1129(a)(9)(C). Estimated amount: [$_______].

**Statutory Fees.** Fees under 28 U.S.C. § 1930 due before the Effective Date will be paid by the Debtor, and thereafter by the Liquidating Debtor until the Case is closed, dismissed, or converted.

### B. Classification and Treatment of Claims and Equity Interests

The treatment of each Class is summarized in Article II.B above and set forth in full in Plan Article IV.

#### 1. Treatment of Guaranty Claims

Solely for purposes of receiving distributions under the Plan, each Holder of an Allowed Guaranty Claim must look first to the applicable borrower, collateral, co-obligors, and other non-Debtor sources of recovery (the "Primary Recovery Sources"). The Plan does not release, impair, or modify a Holder's rights against any Primary Recovery Source.

Unless otherwise agreed by the Holder and the Plan Administrator or ordered by the Bankruptcy Court, no distribution will be made from the Residual Recovery Pool on account of an Allowed Guaranty Claim until (a) the Holder's recovery from the Primary Recovery Sources

has been substantially completed, (b) all value received from the Primary Recovery Sources has been applied to the underlying guaranteed obligations, and (c) the resulting Remaining Guaranty Claim has been determined by agreement or Final Order. The "Remaining Guaranty Claim" is the portion of the Allowed Guaranty Claim remaining unpaid after crediting all value received from the Primary Recovery Sources (other than Plan distributions), with non-Cash property valued by agreement or Final Order.

If recovery from the Primary Recovery Sources has not been completed within a commercially reasonable period, the Holder or the Plan Administrator may ask the Bankruptcy Court to estimate or determine the Remaining Guaranty Claim for purposes of allowance, reserves, and distributions, including under section 502(c) of the Bankruptcy Code, considering the anticipated net realizable value of remaining collateral, anticipated recoveries from obligors, and the cost and time of recovery. Any such determination may provide for later adjustment based on actual recoveries.

Pending determination, the Plan Administrator will reserve from each distribution the amount the Holder would receive based on the Plan Administrator's reasonable estimate of the Remaining Guaranty Claim, after consultation with the Holder and subject to the Holder's right to seek a determination of the reserve by the Bankruptcy Court. Once the Remaining Guaranty Claim is determined, the Holder will receive a catch-up distribution from the reserve and, if necessary, later distributions; any excess reserve will be released to the Residual Recovery Pool.

Each Holder must provide, and supplement, a written accounting of all recoveries from the Primary Recovery Sources. Recoveries received after determination of the Remaining Guaranty Claim reduce that claim and are credited against future distributions, and any aggregate recoveries in excess of the Allowed amount of the Guaranty Claim must be returned to the Liquidating Debtor for inclusion in the Residual Recovery Pool.

### 2. The Distribution Waterfall

The Residual Recovery Pool consists of (a) the Residual Proceeds, (b) net proceeds of the North Freeway Property, (c) net proceeds of Causes of Action, (d) Cash held by the Liquidating Debtor, and (e) proceeds of other assets designated by the Plan Administrator, in each case after payment of or reasonable provision/reserve for the Harris County Tax Claim, the First Insurance Secured Claim, the Exit Facility, Administrative Claims, the Hartman Substantial Contribution Claim, Statutory Fees, taxes, costs of administering the Plan, fees and expenses of the Plan Administrator and its professionals, Disputed Claims, contingent liabilities, and other necessary reserves.

The Equity Distribution Pool consists of all remaining proceeds of the Residual Recovery Pool after payment in full of all Allowed Claims, all costs and fees of the Plan Administrator, and all costs and reserves for the wind-down and dissolution of the Liquidating Debtor. Each Holder of an Allowed Equity Interest's Pro Rata Share will be determined in accordance with the Debtor's books and records, taking into account the results of the Maryland Litigation, with disputes decided by the Bankruptcy Court.

### C. Means for Implementation of the Plan

**Liquidating Debtor.** After the Effective Date, the Liquidating Debtor will continue in existence solely to liquidate the Debtor's assets (including the Downstream Entities and Downstream Assets) and wind down its affairs consistent with its corporate charter and the orders in the Maryland Litigation, resolve Disputed Claims, make distributions, establish reserves, pursue Causes of Action, file tax returns, and administer the Plan (Plan Section 5.1).

**Vesting of Assets.** On the Effective Date, the Debtor's assets will vest in the Liquidating Debtor free and clear of all Liens, Claims, and encumbrances except as provided in the Plan, and the Liquidating Debtor may use or dispose of property and settle Claims and Causes of Action without Bankruptcy Court approval (Plan Section 5.3).

**Exit Facility.** On the Effective Date, the Exit Lender (one or more Plan Proponents or their designated affiliate) will provide the Liquidating Debtor a loan not to exceed [$______], secured by a first-priority lien on the North Freeway Property subject only to the Harris County Tax Claim, on terms set forth in the Exit Facility Loan Documents to be included in the Plan Supplement.

**Termination of Existing Management.** On the Effective Date, each trustee, director, manager, officer, and other member of management of the Debtor will be deemed removed, and the Plan Administrator will have exclusive authority to manage and bind the Liquidating Debtor (Plan Section 5.4). Existing Management must preserve and turn over the Debtor's books, records, and access credentials (Plan Section 5.15).

### D. The Plan Administrator and Oversight Committee

On the Effective Date, the Plan Administrator will be appointed as the sole trustee and authorized representative of the Liquidating Debtor, will succeed to the powers of the Debtor's board of trustees and officers, and will act as a fiduciary for Holders entitled to distributions. The Plan Administrator may exercise every governance and ownership right held by the Liquidating Debtor in its subsidiaries, including the Downstream Entities (Plan Sections 5.5 and 5.6). The initial Plan Administrator will be identified and the Plan Administrator Agreement will be contained in the Plan Supplement.

The Oversight Committee will be established on the Effective Date. The Plan Administrator must consult with the Oversight Committee before entering an affiliate or insider transaction, selling a material Downstream Asset, or settling a material Cause of Action, and must report to it at least quarterly (Plan Section 5.9). The Plan Administrator may resign on 30 days' written notice, effective upon appointment of a successor by majority vote of the Oversight Committee (Plan Section 5.10). The initial members of the Oversight Committee will be identified in the Plan Supplement.

### E. Liquidation of Downstream Entities and Downstream Assets

The Plan Administrator will cause the Downstream Entities to continue operations only as necessary to preserve and maximize value, market and sell Downstream Assets, refinance or repay their debt, and distribute net proceeds upstream when legally permissible, using commercially reasonable marketing and sale procedures (including, as appropriate, a qualified broker) with

periodic reporting to the Oversight Committee. Sale proceeds will first be applied to the Downstream Entity's debt, creditors, transaction expenses, and reasonable reserves; only legally available net proceeds will be distributed upstream as Residual Proceeds. The Plan does not vest Downstream Assets in the Liquidating Debtor or authorize the sale of nondebtor property under section 363 of the Bankruptcy Code (Plan Section 5.7).

## F. Preservation of Causes of Action

Unless expressly waived, released, or settled in the Plan or a Final Order, all Causes of Action will vest in the Liquidating Debtor and be enforceable by the Plan Administrator under section 1123(b) of the Bankruptcy Code (Plan Section 5.14). Preserved Causes of Action include, without limitation, (i) the Debtor's claims in the BSP Adversary and Hartman Adversary; (ii) claims against Existing Management and current and former directors, officers, and insiders, including claims relating to the Debtor's operations and asset dispositions since 2023, the use of sale proceeds, compliance with the Liquidation Order, and the proposed NewCo transaction; (iii) Avoidance Actions, including with respect to prepetition transfers to insiders; and (iv) claims under any applicable insurance policies, including the Policy.

## G. Executory Contracts and Unexpired Leases

On the Effective Date, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assigned will be deemed rejected unless specifically designated for assumption in the Plan or the Assumption Schedule in the Plan Supplement. Cure Claims will be paid on or as soon as practicable after the Effective Date; objections to assumption or Cure amounts must be Filed on or before the Confirmation Hearing. Proofs of Claim for rejection damages must be Filed within 30 days after the later of the Confirmation Date or the effective date of rejection (Plan Article VI).

## H. Distributions

The Plan Administrator has sole discretion over the timing, amount, and frequency of interim and final distributions and may establish reserves. No partial distributions will be made on Disputed Claims or Equity Interests until resolved. The Distribution Record Date is the Confirmation Date, unless otherwise ordered. Distributions unclaimed for six months will become Residual Proceeds. Claims paid by third parties or insurance are reduced accordingly, and the Liquidating Debtor retains setoff rights (Plan Article VII).

## I. Procedures for Resolving Disputed Claims

The Plan Administrator and the Plan Proponents have the sole right to object to Claims and Equity Interests. Objections must be Filed by the Claims Objection Deadline, 180 days after the Effective Date, subject to extension. Postpetition interest will not accrue on Claims, and Claims of Entities liable for turnover or avoidable transfers will be disallowed under the circumstances described in the Plan (Plan Article VIII).

### J. Effect of Confirmation; No Discharge; Injunction

The Plan constitutes a good-faith compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. Consistent with section 1141(d)(3), Confirmation will not discharge the Debtor or the Liquidating Debtor; however, Holders' rights will be governed exclusively by the Plan and the Confirmation Order. The Plan does not release the liability of any nondebtor Entity except as expressly provided. On the Effective Date, Liens against Estate property will be released except as provided in the Plan, and Entities are enjoined from taking actions against the Liquidating Debtor on account of Claims and Interests treated under the Plan (Plan Article IX).

### K. Conditions Precedent to the Effective Date

The Effective Date is subject to, among other things: entry of a Confirmation Order acceptable to the Plan Proponents that is not stayed; Bankruptcy Court authorization of the Plan transactions, including appointment of the Plan Administrator, termination of Existing Management, cancellation of Equity Interests, and the Exit Facility; Filing of the Plan Supplement; acceptance of appointment by the Plan Administrator and Oversight Committee members; execution and funding of the Exit Facility; sufficient Cash for Effective Date payments and reserves; and absence of any order prohibiting consummation. All conditions other than entry of the Confirmation Order may be waived by the Plan Proponents, subject to Exit Lender consent for Exit Facility conditions (Plan Article X).

### L. Modification, Revocation, and Retention of Jurisdiction

The Plan Proponents may amend or modify the Plan in accordance with section 1127 of the Bankruptcy Code and may revoke or withdraw the Plan before the Confirmation Date (Plan Article XI). The Bankruptcy Court will retain jurisdiction over matters arising out of or related to the Chapter 11 Cases and the Plan, including Claims allowance, professional compensation, executory contracts, distributions, and enforcement (Plan Article XII).

### M. Plan Supplement

The Plan Supplement will include (a) the Assumption Schedule, (b) the identity of the initial Plan Administrator, (c) the Plan Administrator Agreement; (d) the members of the Oversight Committee, (e) the Exit Facility Loan Documents, and (f) any other documentation necessary to effectuate the Plan. The Plan Supplement will be Filed no later than [______].

## VII. CONFIRMATION REQUIREMENTS

### A. Requirements of Section 1129(a)

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Plan Proponents, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner; (ii) the Plan complies with the applicable provisions of the Bankruptcy Code; (iii) the Plan Proponents have complied with the applicable provisions of the Bankruptcy Code; (iv) the Plan has been proposed in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the

Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of each Impaired Class (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible; (viii) the Plan is in the "best interests" of all Holders of Claims and Equity Interests in each Impaired Class; and (ix) all fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for their payment. The Plan Proponents believe that the Plan satisfies all of the requirements for Confirmation.

**B. Best Interests Test; Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Allowed Claim or Equity Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code (the "Best Interests Test"). To determine whether the Best Interests Test is satisfied, the Bankruptcy Court must estimate the cash proceeds that a chapter 7 trustee would generate from the liquidation of the Debtor's assets, net of the costs of the chapter 7 case, and compare the resulting recoveries to those under the Plan.

The Plan Proponents believe that Holders of Claims and Equity Interests will receive at least as much under the Plan as they would in a chapter 7 liquidation. A chapter 7 case would add a layer of administrative expense, including the statutory commission of a chapter 7 trustee and the fees of the trustee's professionals, who would need time to become familiar with the Debtor, the Downstream Entities, and the Maryland Litigation. A chapter 7 trustee could face pressure to sell the Debtor's interests in the Downstream Entities or Downstream Assets quickly and at depressed prices, whereas the Plan Administrator will conduct an orderly liquidation with oversight and periodic reporting. Conversion would also trigger a new bar date under Bankruptcy Rule 1019, potentially permitting additional Claims and delaying distributions. For these reasons, the Plan Proponents believe that the Plan satisfies the Best Interests Test.

**C. Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, unless such liquidation is proposed in the Plan (the "Feasibility Test"). Because the Plan is a liquidating plan, feasibility turns on whether the Liquidating Debtor will have sufficient resources to make the payments required on the Effective Date and to fund the wind-down. The Plan is funded by Cash on hand, the Exit Facility, proceeds of the North Freeway Property, Residual Proceeds, and Causes of Action. Given the funding commitment of the Exit Lender, the net proceeds of the North Freeway Property, and the orderly liquidation of the Downstream Assets, the Plan Proponents believe that the Plan Administrator will be able to make all distributions required under the Plan and that the Plan satisfies the Feasibility Test.

**D. Acceptance by Impaired Classes**

Section 1129(a)(8) of the Bankruptcy Code requires that each Class of Claims or Equity Interests that is Impaired under the Plan accept the Plan, subject to the cramdown exception in

section 1129(b). A Class of Claims accepts the Plan if Holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that actually vote cast ballots in favor of the Plan. A Class of Equity Interests accepts the Plan if Holders of at least two-thirds in amount of the Allowed Equity Interests in the Class that actually vote cast ballots in favor of the Plan. Classes 1 and 2 are Unimpaired and are conclusively presumed to accept the Plan. Classes 3, 4, 5, 6, and 7 are Impaired and entitled to vote to accept or reject the Plan.

### E. Confirmation Without Acceptance by All Impaired Classes (Cramdown)

The Plan Proponents request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any rejecting Class and reserve the right to modify the Plan as necessary, including by rendering a Class Unimpaired (Plan Article XIV). Section 1129(b) permits the Bankruptcy Court to confirm the Plan notwithstanding its rejection by one or more Impaired Classes if (i) at least one Impaired Class of Claims has accepted the Plan, determined without including the acceptance of any insider; (ii) the Plan meets all other requirements for Confirmation; and (iii) the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Impaired Class. A plan does not discriminate unfairly if similarly situated Classes are treated in substantially similar ways. A plan is fair and equitable as to a Class of unsecured Claims if no Holder of a junior Claim or Equity Interest receives or retains any property on account of such junior interest unless the non-accepting Class is paid in full, and as to a Class of Equity Interests if no junior interest receives or retains property under the Plan. The Plan Proponents believe that the Plan satisfies these requirements because Holders of Equity Interests receive distributions only after all Allowed Claims are paid in full, and the Guaranty Claims and General Unsecured Claims share Pro Rata in the Residual Recovery Pool.

## VIII. RISK FACTORS

Holders of Claims and Equity Interests should carefully consider the following risk factors, as well as the other information in this Disclosure Statement and the Plan, before voting.

### A. Bankruptcy Law Considerations

**Parties in Interest May Object to the Classification** of **Claims and Equity Interests.** Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if it is substantially similar to the other claims or interests in that class. The Plan Proponents believe the Plan's classification complies with the Bankruptcy Code, but a Holder could challenge it, and the Bankruptcy Court could find that a different classification is required.

**The Plan May Not Be Confirmed.** There can be no assurance that the requisite acceptances will be received or that the Bankruptcy Court will confirm the Plan. The Debtor, Existing Management, or other parties may object to the Plan, the adequacy of this Disclosure Statement, or the solicitation and balloting procedures, and the Bankruptcy Court could decline to confirm the Plan if it finds that any statutory requirement has not been met. If the Plan is not confirmed, it is unclear what distributions Holders would ultimately receive.

**Nonconsensual Confirmation.** If any Impaired Class rejects the Plan, the Plan Proponents intend to seek Confirmation under section 1129(b). The Plan Proponents reserve the right to

modify the Plan as necessary for Confirmation, and any such modification could result in less favorable treatment for a non-accepting Class.

**The Effective Date May Not Occur.** The Effective Date is subject to conditions precedent, including funding of the Exit Facility. There can be no assurance as to whether or when the Effective Date will occur, and delay could increase Administrative Claims and reduce recoveries.

## B. Risks Related to Asset Values and the Liquidation

The value of the Debtor's interests in the Downstream Assets depends on the prices obtained for self-storage and other real property and the amount of secured debt at each Downstream Entity. For example, Cooper Street SPE LLC's properties are subject to HSRE's $17,000,000 loan, which matures December 21, 2026, and HSRE has asserted defaults and holds an agreement for a deed in lieu of foreclosure. Market conditions, timing of sales, and lender enforcement actions could reduce the Residual Proceeds available to the Liquidating Debtor. Likewise, the Debtor has scheduled the value of the North Freeway Property at $1,500,000.00 but there is no guarantee that the market valuation will match the Debtor's internal valuation. In addition, the Plan Proponents lack sufficient information regarding the Downstream Entities and Downstream Assets to make any assurances regarding the value of those entities and assets and the resulting effect on the Residual Recovery Pool available for distribution to Holders of Allowed Claims and Equity Interests.

## C. Risks Related to Claims Estimates, Guaranty Claims, and Recoveries

There can be no assurance that the estimated Claim amounts in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ materially from the estimates. The Plan Administrator and Plan Proponents may object to the amount or classification of any Claim, and estimates cannot be relied on by a Holder whose Claim is subject to objection. Distributions on the Guaranty Claims depend on the timing and amount of recoveries from the Primary Recovery Sources, and on the determination or estimation of each Remaining Guaranty Claim, which may take substantial time. Pending those determinations, the Plan Administrator will hold reserves, which may delay distributions to other Holders. Depending on the outcome of Claim objections and estimations, actual recoveries may differ from the estimated recoveries in this Disclosure Statement.

## D. Risks Related to the Exit Facility and Funding

The Debtor reported only $21,726.00 in cash as of July 31, 2026, and no postpetition receipts. Accordingly, Effective Date payments and initial wind-down costs depend substantially on funding of the Exit Facility and on net proceeds of the North Freeway Property. If the Exit Facility is not funded, the Effective Date may not occur.

## E. Risks Related to the Downstream Entities and Non-Plan Debtors

The Debtor's assets are held principally through Downstream Entities, two of which are Non-Plan Debtors in the Chapter 11 Cases. Creditors of each Downstream Entity, including secured lenders such as HSRE and Ashton Gaskins Storage LLC, must be paid before any value is distributed upstream to the Liquidating Debtor. The Debtor has not filed reports under

Bankruptcy Rule 2015.3, and the Plan Proponents lack complete information concerning the assets and liabilities of the non-debtor Downstream Entities.

**F. Risks Related to the Maryland Litigation and Causes of Action**

Further proceedings are required to undo the implementation of the rights plan, and deadlines to appeal the Appellate Opinion remain stayed until further order of the Bankruptcy Court. The Debtor has argued that giving effect to the Appellate Opinion would alter the Debtor's equity structure. The ultimate allocation of the Equity Distribution Pool may therefore depend on the outcome of further proceedings. Recoveries on Causes of Action are uncertain and may be subject to defenses and litigation costs.

**G. Other Risks**

**Risk of Post-Effective Date Default.** A finding by the Bankruptcy Court that the Plan is feasible does not guarantee that the Liquidating Debtor will be able to meet all of its obligations after the Effective Date. **Contingencies Do Not Affect Validity of Votes.** Distributions may be affected by contingencies, including the outcome of Claim objections and subordination disputes, but the occurrence of any such contingency will not affect the validity of votes cast or require a resolicitation.

## IX. ALTERNATIVES TO CONFIRMATION OF THE PLAN

**A. Liquidation Under Chapter 7**

If the Plan is not confirmed, the Case could be converted to a case under chapter 7 of the Bankruptcy Code, in which a chapter 7 trustee would be appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. As discussed in Section VII.B, the Plan Proponents believe that a chapter 7 liquidation would result in smaller and later distributions than the Plan. A chapter 7 trustee would be entitled to a statutory commission and would retain new professionals who would need to become familiar with the Debtor, the Downstream Entities, the Maryland Litigation, and the pending adversary proceedings. A chapter 7 trustee also may lack the funding the Exit Facility provides and may face pressure to sell the Debtor's interests in the Downstream Entities quickly and at depressed values. In addition, conversion would trigger a new bar date for filing Claims, potentially resulting in additional Claims and further delaying distributions, and the Estate would lose the benefit of the Plan's established deadline for Administrative Claims.

**B. Dismissal of the Case**

If the Case were dismissed, the Debtor would no longer have the protection of the automatic stay, and creditors could pursue their individual remedies against the Debtor and the Downstream Entities, including foreclosure on the Downstream Assets. Creditors would race to enforce their rights, which could result in piecemeal dispositions of assets at depressed values and unequal recoveries among similarly situated creditors. Dismissal also would leave Existing Management in control of the Debtor, notwithstanding the Liquidation Order and the Debtor's charter, both of which require the Debtor to liquidate its assets. The Plan Proponents believe dismissal would produce lower and less certain recoveries than the Plan.

## C. Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtor or another party in interest could propose a different chapter 11 plan. The Debtor's exclusive period to file a plan expired on September 25, 2026, without the Debtor proposing one, and the Debtor has not offered an alternative path to the liquidation required by its charter and the Liquidation Order. Any alternative plan would require additional time and expense to prepare, solicit, and confirm, increasing Administrative Claims and delaying distributions. If an alternative plan could not be confirmed, the Debtor likely would be liquidated under chapter 7, in which case Holders would receive less favorable treatment than under the Plan. The Plan Proponents believe that the Plan provides the most efficient, value-maximizing path available.

# X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS.**

**Confirmation of a chapter 11 plan can have a number of tax implications for the debtor and for holders of claims and interests, including cancellation of indebtedness and capital gains or losses. The tax consequences to Holders may vary based on each Holder's individual circumstances, and certain aspects may be uncertain due to the lack of applicable precedent and the possibility of changes in law. The Plan Proponents have not undertaken a detailed analysis of the tax consequences of the Plan, no ruling has been requested from the Internal Revenue Service or any state or local taxing authority, and no opinion of counsel has been obtained. Accordingly, there can be no assurance that a taxing authority will not challenge any position taken with respect to the Plan, or that such a challenge would not be upheld. The Plan Proponents make no representation regarding the Debtor's tax attributes or their availability following Confirmation.**

## A. Tax Consequences to the Debtor (including REIT Status)

The Debtor has elected to be taxed as a REIT. The orderly liquidation of the Debtor's assets, including sales of Downstream Assets, may result in the recognition of gain or loss, and may affect the Debtor's ability to continue to qualify as a REIT. Any cancellation of indebtedness may also affect the Debtor's tax attributes. After the Effective Date, the Plan Administrator will be responsible for filing all required federal, state, and local tax returns for the Debtor and may request an expedited determination of unpaid tax liability under section 505(b) of the Bankruptcy Code.

## B. Tax Consequences to Holders of Claims

A Holder of an Allowed Claim generally will recognize gain or loss equal to the difference between the amount realized on account of its Claim and its adjusted tax basis in the Claim. The character of any gain or loss, and the treatment of any portion of a distribution allocable to accrued interest, will depend on the Holder's circumstances. Holders of Guaranty Claims may receive distributions over time, which may affect the timing of recognition. Holders should consult their own tax advisors.

**C. Tax Consequences to Holders of Equity Interests**

Under the Plan, existing Equity Interests are cancelled on the Effective Date, and Holders of Allowed Equity Interests are entitled to a Pro Rata Share of the Equity Distribution Pool, if any. Distributions to Holders of Equity Interests may be treated as liquidating distributions, and Holders may recognize gain or loss based on the amounts received and their basis in their shares, which may be affected by the resolution of the Maryland Litigation. Holders should consult their own tax advisors.

**D. Information Reporting and Withholding**

Distributions under the Plan are subject to applicable tax reporting and withholding. The Plan Administrator may require a Holder to provide a taxpayer identification number or other tax documentation as a condition to receiving distributions and may withhold amounts required by law.

Under section 1146(a) of the Bankruptcy Code, transfers of property under the Plan will not be subject to stamp, recording, real estate transfer, or similar taxes (Plan Section 5.17).

## XI. SECURITIES LAW MATTERS

**A. Cancellation of Equity Interests**

On the Effective Date, all Equity Interests in Silver Star Properties REIT, Inc. shall be cancelled and extinguished. Holders of cancelled Equity Interests will receive nothing in the form of a security or other equity interest on account of those cancelled Equity Interests. The treatment of Class 7 is governed by Plan Section 4.2(g); any distribution, if any, is limited to the cash treatment expressly provided there and does not constitute issuance of a security.

**B. No Issuance of Securities**

The Plan does not issue any new securities, including shares, notes, or other equity or debt instruments. Rights to receive distributions under the Plan are not securities and are personal to the applicable Holder; they are non-transferable except by will, intestacy, or operation of law. The Plan Proponents are not relying on the exemption in section 1145 of the Bankruptcy Code in connection with any distribution under the Plan.

**C. Closing of Transfer Books; No Trading Market**

On the Distribution Record Date, the Debtor’s stock transfer books and transfer ledgers will be closed, and no transfers of Equity Interests thereafter will be recognized. The Distribution Record Date is the Confirmation Date unless otherwise ordered by the Bankruptcy Court; in any event, the transfer books and ledgers will remain closed as of the Effective Date. No trading market for any cancelled Equity Interests or for rights to receive distributions under the Plan is expected to develop, and Holders should not trade or attempt to transfer those Equity Interests or distribution rights.

### D. Exchange Act Reporting and Deregistration

As described in Sections IV.A and IV.E, the Debtor is delinquent in its periodic reporting obligations and has not filed an annual report on Form 10-K or a quarterly report on Form 10-Q with the SEC since its Form 10-Q filed on November 20, 2023, covering the third quarter of 2023. The Plan Proponents understand that draft Forms 10-K and 10-Q have not been filed with the SEC. The Plan authorizes the filing of Form 15 to terminate the registration of the Debtor's registered class of securities and suspend the Debtor's reporting obligations under the Securities Exchange Act of 1934.

### E. No SEC Approval

This Disclosure Statement has not been approved or reviewed by the SEC or any state securities regulator. No representation is made that the SEC or any state securities regulator has passed upon the accuracy or adequacy of this Article or any other information in this Disclosure Statement. Holders should consult their own legal, business, financial, and tax advisors regarding the Plan and the transactions contemplated thereby.

## XII. CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that Confirmation of the Plan is in the best interests of Holders of Claims and Equity Interests and urge all Holders entitled to vote to accept the Plan by returning their ballots so that they are actually received on or before the Voting Deadline.

[*signature page follows*]

Dated: October [___], 2026

*<u>/s/ Allen Hartman</u>*
Allen Hartman, Individually and on behalf of
Hartman vREIT XXI, Inc., Plan Proponents

# EXHIBIT A

John D. Gaither, Tex. Bar No. 24055516
Samantha Espino, Tex. Bar No. 24131801
**Wick Phillips Gould & Martin, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Phone: (214) 692-6200
john.gaither@wickphillips.com
samantha.espino@wickphillips.com

**Counsel for Hartman vREIT XXI, Inc.
and Al Hartman**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **Silver Star Virginia Parkway LLC,** ***et al.*** | § | **Case No. 26-42315-mxm11** |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**HARTMAN PARTIES' CHAPTER 11 PLAN OF LIQUIDATION
FOR DEBTOR SILVER STAR PROPERTIES REIT, INC.**

John D. Gaither, Tex. Bar No. 24055516
Samantha Espino, Tex. Bar No. 24131801
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Phone: (214) 692-6200
john.gaither@wickphillips.com
samantha.espino@wickphillips.com

**COUNSEL FOR HARTMAN vREIT XXI, INC.
AND AL HARTMAN, PLAN PROPONENTS**

[1] The Debtors in these proceedings (including their respective taxpayer identification numbers) are: Silver Star Virginia Parkway LLC (99-3308488); Silver Star Properties REIT, Inc. (26-3455189); and Cooper Street SPE LLC (93-4893154). The Debtors' corporate headquarters are: 100 N. Forest Park Blvd., Suite 100, Fort Worth, TX 76102.

## TABLE OF CONTENTS

**I. INTRODUCTION** .......... 1
**II. DEFINED TERMS AND INTERPRETATION** .......... 1
**2.1 Defined Terms** .......... 1
**2.2 Controlling Document** .......... 10
**2.3 Nonconsolidated Plan** .......... 10
**III. UNCLASSIFIED CLAIMS** .......... 10
**3.1 Administrative Claims** .......... 10
**3.2 Hartman Substantial Contribution Claim** .......... 11
**3.3 Priority Tax Claims** .......... 11
**3.4 Statutory Fees** .......... 11
**IV. CLASSIFIED CLAIMS AND EQUITY INTERESTS** .......... 11
**4.1 Classification** .......... 11
**4.2 Treatment of Claims and Interests** .......... 12
**4.3 Treatment of Guaranty Claims** .......... 14
**4.4 Special Provision Governing Unimpaired Claims** .......... 15
**4.5 Elimination of Vacant Classes** .......... 15
**4.6 Voting Classes; Presumed Acceptance by Non-Voting Classes** .......... 15
**V. PROVISIONS FOR IMPLEMENTATION OF THE PLAN** .......... 15
**5.1 Liquidating Debtor** .......... 16
**5.2 Sources of Consideration for Plan Distribution** .......... 16
**5.3 Vesting of Assets in Liquidating Debtor** .......... 16
**5.4 Termination of Existing Officers and Directors** .......... 16
**5.5 Appointment of the Plan Administrator** .......... 16
**5.6 Powers and Authority of the Plan Administrator** .......... 17
**5.7 Liquidation of Downstream Entities and Downstream Assets** .......... 17
**5.8 Compensation and Reimbursement of the Plan Administrator** .......... 18
**5.9 Appointment of the Oversight Committee** .......... 18
**5.10 Resignation of the Plan Administrator** .......... 18
**5.11 Dissolution of the Debtor** .......... 19
**5.12 Corporate Action** .......... 19
**5.13 Effectuating Documents; Further Transactions** .......... 19
**5.14 Preservation of Causes of Action** .......... 19

**5.15 Preservation and Turnover of Books and Records ....................20**
**5.16 Securities Laws Matters ....................20**
**5.17 Exemption from Certain Taxes and Fees ....................21**
**5.18 Retiree Benefits ....................21**
**VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................... 22**
**6.1 Assumption of Executory Contracts and Unexpired Leases ....................22**
**6.2 Cure of Defaults and Objections to Cure and Assumption ....................22**
**6.3 Rejection Damages Claims and Objections to Rejections ....................22**
**6.4 Reservation of Rights ....................23**
**VII. DISTRIBUTIONS .................... 23**
**7.1 Distributions on Account of Claims and Equity Interests ....................23**
**7.2 Special Rules for Distributions to Holders of Disputed Claims and Interests ....................23**
**7.3 Delivery of Distributions ....................23**
**7.4 Claims Paid or Payable by Third Parties ....................24**
**7.5 Setoffs ....................25**
**VIII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS .................... 26**
**8.1 Prosecution of Objections to Claims and Equity Interests ....................26**
**8.2 Disallowance ....................26**
**IX. EFFECT OF CONFIRMATION OF THE PLAN .................... 26**
**9.1 General Settlement of Claims ....................26**
**9.2 No Discharge; Treatment of Claims and Interests ....................26**
**9.3 Term of Injunctions or Stays ....................27**
**9.4 Release of Liens ....................27**
**9.5 Injunction ....................27**
**9.6 Reimbursement or Contribution ....................28**
**X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .................... 28**
**10.1 Conditions Precedent ....................28**
**10.2 Waiver of Conditions Precedent ....................29**
**10.3 Occurrence of the Effective Date ....................29**
**10.4 Effect of Non-Occurrence of Conditions Precedent ....................29**
**XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .................... 29**
**11.1 Plan Modification ....................29**
**11.2 Plan Revocation or Withdrawal ....................29**

**XII. JURISDICTION ........ 30**

**12.1 Retention of Jurisdiction ........ 30**

**12.2 Abstention of Jurisdiction ........ 31**

**XIII. MISCELLANEOUS ........ 31**

**13.1 Reservation of Rights ........ 31**

**13.2 Entire Agreement ........ 31**

**13.3 Plan Supplement Exhibits ........ 31**

**13.4 Non-Severability ........ 31**

**XIV. CRAMDOWN REQUEST ........ 32**

## I. INTRODUCTION

Silver Star Properties REIT, Inc. (the "Debtor") filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on May 28, 2026 (the "Petition Date") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"), commencing the bankruptcy case styled *In re Silver Star Properties REIT, Inc.*, Case No. 26-42316 (the "Case").[2] The exclusivity period during which the Debtor had the exclusive right to file a chapter 11 plan expired on September 25, 2026, without the Debtor having filed a plan.

Hartman vREIT XXI, Inc. and Al Hartman, creditors, shareholders, and parties in interest (collectively, the "Plan Proponents"), propose this Plan for the orderly liquidation of the Debtor in accordance with its corporate charter and the orders entered in the Maryland litigation. This Plan provides for the replacement of the Debtor's Existing Management with the Plan Administrator to oversee the orderly winddown and liquidation of the Debtor, along with the Downstream Entities and Downstream Assets, while also providing for treatment of all outstanding Claims against, and Interests in, Debtor. Although for purposes of administrative convenience and efficiency the Case is being jointly administered with bankruptcy cases of the Non-Plan Debtors, this Plan is filed only for the Debtor and only provides treatment for Classes of Claims against, and Interests in, the Debtor.

Reference is made to the Disclosure Statement for a discussion of the Debtor's history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan and certain related matters.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN**.

Subject to the terms of this Plan and certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents expressly reserve the right to alter, amend, modify, revoke or withdraw the Plan, one or more times, prior to its substantial consummation.

## II. DEFINED TERMS AND INTERPRETATION

**2.1. Defined Terms.** For purposes of this Plan, except as otherwise provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meaning set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or Bankruptcy Rules, will have the meaning given to the term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1. "Administrative Claim" means a Claim for costs and expenses of administration of the Case pursuant to sections 327, 328, 330, 331, 363, 365, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) any actual and necessary costs and expenses of preserving the Estate incurred commencing on or after the Petition Date until and including

[2] Capitalized terms used in this Plan shall have the meanings set forth in ARTICLE II below.

the Effective Date; (b) all fees and charges assessed against the Estate under title 28 of the United States Code, to the extent not already paid or satisfied under the terms of the Plan; and (c) any other obligation designated as an Allowed Administrative Claim pursuant to a Final Order of the Bankruptcy Court.

2. "Administrative Claims Bar Date" means the deadline for Filing requests for allowance and payment of Administrative Claims, except as otherwise set forth in the Plan, which shall be 30 days after the Effective Date.

3. "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

4. "Allowed" when used with respect to all or any part of a Claim or Equity Interest, means:

a. if no Proof of Claim has been timely filed, such amount of the Claim or group of Claims which has been Scheduled by the Debtor as liquidated in amount and not disputed or contingent and as to which no party in interest has filed an objection before the Claims Objection Deadline or such other time fixed by the Bankruptcy Court, and which Claim is not disallowed under section 502(d) or (e) of the Bankruptcy Code;

b. if a Proof of Claim has been filed by the Claims Bar Date, or is deemed timely filed by the Bankruptcy Court pursuant to Final Order, such amount of the Claim as to which any party in interest has not filed an objection before the Claims Objection Deadline or such other time fixed by the Bankruptcy Court and which Claim is not disallowed under section 502(d) or (e) of the Bankruptcy Code;

c. that has been allowed by a Final Order of the Bankruptcy Court; or

d. that is expressly allowed in a liquidated amount in this Plan.

5. "Allowed Equity Interest" means an Equity Interest that: (a) is reflected in the stock ledger, shareholder register, or other ownership records maintained by or on behalf of the Debtor, including by any transfer agent, as of the Distribution Record Date; and (b) is not subject to a timely objection by the Plan Administrator or has otherwise been allowed by a Final Order of the Bankruptcy Court, in each case subject to the results of the Maryland Litigation and any applicable order entered therein. Unless otherwise ordered by the Bankruptcy Court, a Holder whose Equity Interest is reflected in such records shall not be required to file a Proof of Interest.

6. "Assumption Schedule" means the schedule of Executory Contracts and Unexpired Leases in the Plan Supplement, as may be amended from time to time, setting forth certain Executory Contracts and Unexpired Leases for assumption, or assumption and assignment, as of the Effective Date under section 365 of the Bankruptcy Code.

7. "Avoidance Actions" means any and all Causes of Action and remedies arising under sections 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code or under any analogous federal, state, local, or foreign law, including any Causes of Action to avoid or

recover a transfer of property or an obligation incurred by the Debtor and all proceeds thereof. For the avoidance of doubt, Avoidance Actions do not include rights arising solely under sections 502, 510, 541, 542, or 543 of the Bankruptcy Code.

8. "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.*, as may be amended from time to time to the extent such amendments are applicable to the Case.

9. "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

10. "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended and applicable to the Case.

11. "Business Day" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

12. "Case" means the chapter 11 proceeding pending for the Debtor styled *In re Silver Star Properties REIT, Inc.*, Case No. 26-42316, filed in the Bankruptcy Court, and jointly administered under Case No. 26-42315.

13. "Cash" means the legal tender of the United States of America or the equivalent thereof, including, without limitation, bank deposits and checks.

14. "Causes of Action" means, with respect to the Debtor, its Estate, and the Liquidating Debtor, any and all actions, proceedings, claims, cross-claims, third-party claims, causes of action, controversies, choses in action, demands, rights, Liens, indemnities, contributions, guaranties, suits, obligations, liabilities, debts, damages, judgments, accounts, defenses, remedies, offsets, powers, privileges, licenses, bonds, covenants, and franchises of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, including (a) any right of setoff, cross-claim, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; and (f) any Avoidance Actions. Unless released under this Plan, all such Causes of Action will be reserved under the Plan and vested in the Liquidating Debtor.

15. "Chapter 11 Cases" means the procedurally jointly administered chapter 11 cases pending for the Debtor and the Non-Plan Debtors in the Bankruptcy Court.

16. "Claim" or "Claims" means a claim against the Debtor, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

17. "Claims Bar Date" means: (a) the general bar date of September 24, 2026 with respect to filing proofs of claim or proofs of interest by Creditors other than a governmental unit; and (b) the governmental bar date of November 24, 2026 with respect to filing proofs of claim or proofs of interest by a governmental unit.

18. "Claims Objection Deadline" means the deadline for objecting to a Claim, which shall be on the date that is 180 days after the Effective Date, subject to extension by order of the Bankruptcy Court upon the request by the Liquidating Debtor.

19. "Class" means a category of Holders of Claims or Interests as classified in this Plan under section 1122(a) of the Bankruptcy Code.

20. "Confirmation" means the entry of the Confirmation Order on the docket of the Case.

21. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Case within the meaning of Bankruptcy Rules 5003 and 9021.

22. "Confirmation Hearing" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Plan Proponents seek entry of the Confirmation Order.

23. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

24. "Consummation" means the occurrence of the Effective Date.

25. "Creditor" has the meaning set forth in section 101(10) of the Bankruptcy Code.

26. "Cure Claim" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtor's default under an Executory Contract or Unexpired Lease assumed by the Debtor under section 365 of the Bankruptcy Code, other than a default which is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

27. "Cure Notice" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall be included with the Assumption Schedule.

28. "Debtor" means Silver Star Properties REIT, Inc.

29. "Disclosure Statement" means the Bankruptcy Court-approved disclosure statement for the Plan filed by the Plan Proponents as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto.

30. "Disputed" means, as to a Claim or an Interest, that the Claim or an Interest is not yet Allowed.

31. "Distribution Agent" means the Liquidating Debtor, the Plan Administrator, or the Entity or Entities selected by the Debtor or the Plan Administrator, to make or facilitate distributions contemplated under the Plan.

32. "Distribution Record Date" means the date for determining which Holders of Allowed Claims or Allowed Equity Interests are eligible to receive distributions hereunder, which shall be (a) the Confirmation Date or (b) such other date as designated in a Final Order of the Bankruptcy Court.

33. "Downstream Asset" means any asset owned or held by a Downstream Entity, including but not limited to any claims and causes of action held by such entity.

34. "Downstream Entity" means any Entity in which the Debtor holds a direct or indirect interest.

35. "Effective Date" means the first Business Day selected by the Plan Proponents that occurs after the Confirmation Date and on which all conditions precedent set forth in ARTICLE X have been satisfied or waived in accordance with the Plan, as evidenced by the filing of the Notice of Effective Date.

36. "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

37. "Equity Distribution Pool" means all remaining proceeds of the Residual Recovery Pool after payment in full of (i) all Allowed Claims, (ii) all costs and fees of the Plan Administrator, and (iii) all costs and reserves required under the Plan related to the winddown and dissolution of the Liquidating Debtor.

38. "Equity Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtor.

39. "Estate" means the bankruptcy estate of the Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the Case.

40. "Executory Contract" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

41. "Existing Management" has the meaning ascribed to it in Section 5.15 of the Plan.

42. "Exit Facility" means a loan in the amount not to exceed [$______] to be provided to the Liquidating Debtor on the Effective Date by the Exit Lender pursuant to the Exit Facility Loan Documents, which loan shall be secured by a first-priority lien on the North Freeway Property subject only to the Harris County Tax Claim.

43. "Exit Facility Loan Documents" means all loan and security agreements and related documents under which the Plan Proponents, or their designated affiliate, will provide the Exit

Facility, which documents shall be included in the Plan Supplement, which shall be in form and substance satisfactory to the Plan Proponents in their sole discretion.

44. "Exit Lender" shall mean one or more of the Plan Proponents, or their designated affiliate, as identified in the Exit Facility Loan Documents.

45. "File," "Filed," or "Filing" means file, filed, or filing in the Case with the Bankruptcy Court.

46. "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility of a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable non-bankruptcy law, may be filed relating to such order or judgment shall not prevent such order or judgment from being a Final Order.

47. "First Insurance Secured Claim" means the Secured Claim asserted against the Debtor by First Insurance Funding via Proof of Claim No. 14.

48. "General Unsecured Claim" means any Claim against the Debtor, or any portion thereof, that is not an Administrative Claim, Priority Tax Claim, Secured Claim, HSRE Guaranty Claim, Greyhawk Guaranty Claim, or Wells Fargo Guaranty Claim. General Unsecured Claims include any unsecured deficiency Claim arising under section 506(a) of the Bankruptcy Code from the First Insurance Secured Claim and any Claim arising from the rejection of an Executory Contract or Unexpired Lease, in each case to the extent not otherwise classified under the Plan.

49. "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

50. "Greyhawk Collateral" means all collateral assets validly securing the primary obligations of the "Borrowers" as defined in Proof of Claim No. 17 by Greyhawk Silver Star, LLC filed against the Debtor.

51. "Greyhawk Guaranty Claim" means the Claim asserted against the Debtor in the Case via Proof of Claim No. 17 by Greyhawk Silver Star, LLC.

52. "Guaranty Claims" means, collectively, the HSRE Guaranty Claim, the Greyhawk Guaranty Claim, and the Wells Fargo Guaranty Claim.

53. "Harris County Tax Claim" means any Claim asserted by Harris County, Texas, or any other taxing unit represented by or acting through the Harris County Tax Assessor-

Collector, against the Debtor on account of ad valorem taxes assessed against the North Freeway Property, including any interest, penalties, fees, costs, or other amounts included in such Claim, to the extent Allowed, which Claim is asserted to be secured by a Lien on the North Freeway Property.

54. "Hartman Substantial Contribution Claim" means the Administrative Claim of the Plan Proponents under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for the actual and necessary expenses incurred, and the reasonable compensation and expenses of the Plan Proponents' professionals, in making a substantial contribution in the Case, in the aggregate amount approved and allowed by the Bankruptcy Court.

55. "Holder" means an Entity holding a Claim or an Equity Interest, as the context requires.

56. "HSRE Collateral" means all collateral assets validly securing the primary obligation of Cooper Street SPE, LLC in connection with the HSRE Guaranty Claim.

57. "HSRE Guaranty Claim" means the Claim asserted against the Debtor in the Case via Proof of Claim No. 18 by HSRE-ADV VII, LLC.

58. "Impaired" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

59. "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

60. "Liquidating Debtor" means the Debtor or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

61. "Maryland Litigation" means *Allen R. Hartman, et al. v. Silver Star Properties REIT, Inc., et al.*, filed in the Circuit Court for Baltimore City and Case No. 2441, *Allen R. Hartman v. Silver Star Properties REIT, Inc., et al.*, filed in the Appellate Court of Maryland.

62. "Non-Plan Debtors" means, collectively: Silver Star Virginia Parkway LLC; Cooper Street SPE LLC; and any other debtor, other than the Debtor, whose bankruptcy case is jointly administered with the Chapter 11 Cases, from time to time.

63. "North Freeway Property" means the real property scheduled on Part 9 of Schedule A/B filed by the Debtor at ECF 1 and described therein as RES A BLK 1, SYRACUSE RENAISSANCE PARTNERS, SEC 1, 0.7090 AC, and located at 17211 North Freeway, Houston, Texas 77090.

64. "Notice of Effective Date" means the notice filed by the Plan Proponents with the Bankruptcy Court stating that all conditions precedent to the Effective Date have been satisfied or waived and identifying the Effective Date.

65. "Oversight Committee" means the committee established pursuant to Section 5.8 of the Plan. The initial members of the Oversight Committee shall be identified in the Plan Supplement.

66. "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

67. "Petition Date" means May 28, 2026.

68. "Plan" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time, including the Plan Supplement and all exhibits, supplements, appendices, and schedules.

69. "Plan Administrator" means the Person or Entity appointed under Section 5.5 of this Plan, or such Person or Entity's successor appointed in accordance with Section 5.9 of the Plan. The initial Plan Administrator shall be identified in the Plan Supplement.

70. "Plan Administrator Agreement" means the agreement governing the appointment, duties, compensation, reimbursement, indemnification, and other terms of service of the Plan Administrator, substantially in the form included in the Plan Supplement.

71. "Plan Proponents" means, collectively, Hartman vREIT XXI, Inc. and Al Hartman, solely in their capacities as proponents of the Plan

72. "Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Plan Proponents and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following: (a) Assumption Schedule; (b) the identity of the initial Plan Administrator; (c) the Plan Administrator Agreement; (d) the members of the Oversight Committee; (e) the Exit Facility Loan Documents; and (f) any and all other documentation necessary to effectuate the Plan or that is contemplated by the Plan.

73. "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

74. "Pro Rata Share" means, with respect to any distribution from a particular distribution pool, the ratio, expressed as a percentage, that the Allowed amount of a Holder's Claim or Equity Interest entitled to share in such distribution pool bears to the aggregate Allowed amount of all Claims or Equity Interests entitled to share in the same distribution pool. With respect to distributions from the Residual Recovery Pool, a Holder's Pro Rata Share shall be calculated using (a) the Allowed amount of such Holder's General Unsecured Claim or Allowed Remaining Guaranty Claim, as applicable, as the numerator and (b) the aggregate amount of all Allowed General Unsecured Claims and Allowed Remaining Guaranty Claims entitled to share in the Residual Recovery Pool as the denominator. No portion of a Guaranty Claim that has been satisfied, or is required to be credited, from the applicable borrower, collateral, co-obligor, or other source shall be included in calculating any Pro Rata Share. Solely for purposes of establishing reserves, the Plan Administrator may use a reasonable estimate of any Disputed Claim or undetermined Remaining Guaranty Claim, subject to further order of the Bankruptcy Court.

75. "Proof of Claim" means a proof of Claim filed against the Debtor in the Case.

76. "Proof of Interest" means a proof of Equity Interest filed against the Debtor in the Case.

77. "Remaining Guaranty Claim" means, with respect to an Allowed Guaranty Claim, the portion of such Allowed Guaranty Claim remaining unpaid after crediting against the underlying guaranteed obligations all Cash, proceeds, payments, distributions, credits, and other value received or realized by the Holder from or on account of the applicable borrower, collateral, co-obligor, or other source, other than distributions received under the Plan. The amount of any non-Cash property received or retained shall be the value agreed upon by the Holder and the Plan Administrator or determined by Final Order of the Bankruptcy Court. The amount of a Remaining Guaranty Claim shall be determined by agreement of the Holder and the Plan Administrator or by Final Order of the Bankruptcy Court in accordance with the provisions governing treatment of Guaranty Claims under the Plan.

78. "Residual Proceeds" means all Cash and other property actually received by the Liquidating Debtor from, through, or on account of any Downstream Entity or Downstream Asset, including: (a) dividends and other distributions; (b) repayments of intercompany obligations; (c) proceeds from the sale, refinancing, or other disposition of any Downstream Asset or any direct or indirect interest in a Downstream Entity; (d) returns of capital; and (e) distributions made in connection with the liquidation or dissolution of any Downstream Entity; in each case, solely to the extent legally available for distribution to the Liquidating Debtor after payment or reasonable provision at the applicable Downstream Entity for its valid and enforceable Claims and obligations, taxes, transaction expenses, operating and winddown expenses, and such reasonable reserves as the Plan Administrator determines are necessary or appropriate.

79. "Residual Recovery Pool" means all Cash and other property available for distribution to Holders of the Allowed HSRE Guaranty Claim, the Allowed Greyhawk Guaranty Claim, the Allowed Wells Fargo Guaranty Claim, and Allowed General Unsecured Claims, consisting of: (a) the Residual Proceeds; (b) the net proceeds from the sale or other disposition of the North Freeway Property; (c) the net proceeds of the prosecution, settlement, or other resolution of the Causes of Action; (d) Cash held by the Liquidating Debtor; and (e) the proceeds of any other assets of the Liquidating Debtor designated by the Plan Administrator for distribution to such Holders; in each case, after payment or reasonable provision for the Harris County Tax Claim, the First Insurance Secured Claim, the Exit Facility and all obligations arising thereunder, Administrative Claims, the Hartman Substantial Contribution Claim, Statutory Fees, taxes, costs and expenses of administering and implementing the Plan, fees and expenses of the Plan Administrator and its professionals, Disputed Claims, contingent and unliquidated liabilities, and such other reserves as the Plan Administrator determines are reasonably necessary or appropriate.

80. "Secured Claim" means a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

81. "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim or Equity Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Plan Administrator of an intent to accept a particular distribution; (c) responded to the Plan Administrator's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

82. "Unexpired Lease" means a lease of nonresidential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

83. "Unimpaired" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

84. "U.S. Trustee" means the Office of the United States Trustee for the Northern District of Texas.

85. "Wells Fargo Collateral" means all collateral assets validly securing the primary obligation of Hartman Retail III, DST in connection with the Wells Fargo Guaranty Claim.

86. "Wells Fargo Guaranty Claim" means the Claim asserted against the Debtor in the Case via Proof of Claim No. 6 by Wells Fargo Bank, National Association, as Trustee for the Benefit of the Holders of Benchmark 2019-B10 Mortgage Trust Commercial Mortgage Pass Through Certificates, Series 2019-B10.

**2.2. Controlling Document.** In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

**2.3. Nonconsolidated Plan.** Although for purposes of administrative convenience and efficiency the Debtor's bankruptcy case is being jointly administered with the Non-Plan Debtors, this Plan is filed only for the Debtor and only presents Classes of Claims against, and Interests in, the Debtor. The Plan does not provide for the substantive consolidation of any of the Non-Plan Debtors.

## III. UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE IV.

### 3.1. Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Plan Administrator, as applicable, each Holder of an Allowed Administrative Claim (other than Holders

of Claims for fees and expenses pursuant to 28 U.S.C. § 1930) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Effective Date, or as soon as practicable thereafter; or (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter.

**3.2. Hartman Substantial Contribution Claim**

Except to the extent that the Holder of the Hartman Substantial Contribution Claim agrees to different treatment, the Hartman Substantial Contribution Claim shall receive Cash equal to the Allowed amount of such Claim to be paid at the closing of the sale of the North Freeway Property, with any remaining unpaid balance to be paid from the Residual Proceeds.

**3.3. Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to different treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the Plan Administrator's election: (a) Cash equal to the Allowed amount of such Claim; or (b) regular installment payments in Cash having a value, as of the Effective Date, equal to the Allowed amount of such Claim, with interest at the rate determined under section 511 of the Bankruptcy Code, over a period ending not later than five years after the Order for Relief, and otherwise in compliance with section 1129(a)(9)(C) of the Bankruptcy Code.

**3.4. Statutory Fees.**

All fees due and payable pursuant to 28 U.S.C. § 1930 before the Effective Date shall be paid by the Debtor. On and after the Effective Date, to the extent applicable, the Liquidating Debtor shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Liquidating Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## IV. CLASSIFIED CLAIMS AND EQUITY INTERESTS

**4.1. Classification**.

Except for the Claims addressed in ARTICLE III, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Harris County Tax Claims | Unimpaired | Presumed to Accept |
| 2 | First Insurance Secured Claim | Unimpaired | Presumed to Accept |
| 3 | HSRE Guaranty Claim | Impaired | Entitled to Vote |
| 4 | Greyhawk Guaranty Claim | Impaired | Entitled to Vote |
| 5 | Wells Fargo Guaranty Claim | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Equity Interests | Impaired | Entitled to Vote |

**4.2. Treatment of Claims and Interests.**

a. Class 1 – Harris County Tax Claim.

i. Classification. Class 1 consists of the Harris County Tax Claim against the Debtor.

ii. Treatment. Except to the extent that a Holder of the Harris County Tax Claim agrees to different treatment, the Holder of the Harris County Tax Claim shall receive regular installment payments satisfying section 1129(a)(9)(D) of the Bankruptcy Code, with interest as required by section 511 of the Bankruptcy Code. The Holder of the Harris County Tax Claim shall retain its Lien until the Harris County Tax Claim is paid in full.

iii. Voting. Class 1 is Unimpaired and is deemed to accept the Plan.

b. Class 2 – First Insurance Secured Claim.

i. Classification. Class 2 consists of the First Insurance Secured Claim against the Debtor.

ii. Treatment. The First Insurance Secured Claim shall be bifurcated pursuant to section 506(a) of the Bankruptcy Code into (a) a Secured Claim in an amount equal to the lesser of (i) the total amount of such Claim and (ii) the value of the Holder of such Claim's interest in the Estate's interest in the collateral securing such Claim, as determined by agreement of the Holder or Final Order of the Bankruptcy Court (the "Allowed Secured Amount"), and (b) an unsecured deficiency Claim equal to the balance of such Allowed Claim. Except to the extent that the Holder of the First Insurance Secured Claim agrees to different treatment, the Holder of the First Insurance Secured Claim shall receive, at the Plan Administrator's election, on account of its Allowed Secured Amount: (i) Cash equal to the Allowed Secured Amount or (ii) the collateral securing such Claim, in full satisfaction of the Allowed Secured Amount. Each Holder shall retain its valid and enforceable Lien solely to the extent of the Allowed Secured Amount until such amount is paid or otherwise satisfied in accordance with the Plan, at which time such Lien shall be deemed released. Any unsecured

deficiency Claim on account of the First Insurance Secured Claim shall be treated as a General Unsecured Claim under Class 6.

iii. Voting. Class 2 is Unimpaired and is deemed to accept the Plan.

c. Class 3 – HSRE Guaranty Claim.

i. Classification. Class 3 consists of the HSRE Guaranty Claim against the Debtor.

ii. Treatment. Except to the extent that the Holder agrees to different treatment, the Holder of the Allowed HSRE Guaranty Claim shall receive, on account of its Remaining Guaranty Claim, the treatment provided under the "Treatment of Guaranty Claims" provisions of the Plan

iii. Voting. Class 3 is Impaired and is entitled to vote on the Plan.

d. Class 4 – Greyhawk Guaranty Claim.

i. Classification. Class 4 consists of the Greyhawk Guaranty Claim against the Debtor.

ii. Treatment. Except to the extent that the Holder agrees to different treatment, the Holder of the Allowed Greyhawk Guaranty Claim shall receive, on account of its Remaining Guaranty Claim, the treatment provided under the "Treatment of Guaranty Claims" provisions of the Plan

iii. Voting. Class 4 is Impaired and is entitled to vote on the Plan.

e. Class 5 – Wells Fargo Guaranty Claim.

i. Classification. Class 5 consists of the Wells Fargo Guaranty Claim against the Debtor.

ii. Treatment. Except to the extent that the Holder agrees to different treatment, the Holder of the Allowed Wells Fargo Guaranty Claim shall receive, on account of its Remaining Guaranty Claim, the treatment provided under the "Treatment of Guaranty Claims" provisions of the Plan

iii. Voting. Class 5 is Impaired and is entitled to vote on the Plan.

f. Class 6 – General Unsecured Claims.

i. Classification. Class 6 consists of all General Unsecured Claims against the Debtor.

ii. Treatment. Except to the extent that the Holder of a General Unsecured Claim agrees to different treatment, Holders of General Unsecured Claims shall receive a Pro Rata Share of the Residual Recovery Pool.

iii. Voting. Class 6 is Impaired and is entitled to vote on the Plan.

g. Class 7 – Equity Interests.

i. Classification. Class 7 consists of all Equity Interests in the Debtor.

ii. Treatment. On the Effective Date, all existing Equity Interests in the Debtor shall be cancelled and extinguished. Each Holder of an Allowed Equity Interest shall receive its Pro Rata Share of the Equity Distribution Pool. Each Holder of an Allowed Equity Interest's Pro Rata Share of the Equity Distribution Pool shall be determined by its Pro Rata Share of Equity Interests as of the Effective Date, which shall be determined in accordance with the Debtor's books and records taking into account the results of the Maryland Litigation. Any disputes concerning a Holder of an Allowed Equity Interest's Pro Rata Share of the Equity Distribution Pool shall be decided by the Bankruptcy Court. For the avoidance of doubt, Holders of Allowed Equity Interests shall not receive or retain any property under this Plan unless and until all Allowed Claims, whether classified or unclassified, have been paid in full.

iii. Voting. Class 7 is Impaired and is entitled to vote on the Plan.

**4.3. Treatment of Guaranty Claims**

Solely for purposes of receiving distributions under the Plan, each Holder of an Allowed Guaranty Claim shall look first to the applicable borrower, collateral, co-obligors, and other non-Debtor sources of recovery with respect to the underlying guaranteed obligations (collectively, the "Primary Recovery Sources"). Nothing in this Section shall release, impair, or otherwise modify the Holder's rights against any Primary Recovery Source.

Except as otherwise agreed by the Holder and the Plan Administrator or ordered by the Bankruptcy Court, no distribution shall be made from the Residual Recovery Pool on account of an Allowed Guaranty Claim unless and until: (a) the Holder's recovery from the Primary Recovery Sources has been substantially completed; (b) all Cash, proceeds, payments, distributions, credits, and other value received or realized from the Primary Recovery Sources have been applied in reduction of the underlying guaranteed obligations; and (c) the resulting Remaining Guaranty Claim has been determined by agreement of the Holder and the Plan Administrator or by Final Order of the Bankruptcy Court.

If liquidation of or recovery from the Primary Recovery Sources has not been completed within a commercially reasonable period, the Holder or the Plan Administrator may request that the Bankruptcy Court estimate or determine the Remaining Guaranty Claim for purposes of allowance, reserves, and distributions under the Plan, including pursuant to section 502(c) of the Bankruptcy Code. In making such determination, the Bankruptcy Court may consider the anticipated net realizable value of any remaining collateral, the anticipated recovery from any borrower or other obligor, the costs and time required to obtain such recovery, and any other

relevant circumstances. Any such determination may provide for an appropriate subsequent adjustment based upon amounts actually recovered.

Pending determination of a Remaining Guaranty Claim, the Plan Administrator shall establish an appropriate reserve from each distribution from the Residual Recovery Pool. The reserve shall equal the amount the Holder would receive from such distribution based upon the Plan Administrator's reasonable estimate of the potential Remaining Guaranty Claim, after consultation with the Holder and subject to the Holder's right to seek determination of the reserve by the Bankruptcy Court. Establishment of a reserve shall not constitute allowance of the Guaranty Claim or determination of the Remaining Guaranty Claim.

After a Remaining Guaranty Claim has been determined, the Holder shall receive from the applicable reserve, and if necessary from subsequent distributions from the Residual Recovery Pool, the distributions that the Holder would have received had the Remaining Guaranty Claim been determined before the applicable prior distributions. Any portion of the reserve exceeding the amount required for such distributions shall be released to the Residual Recovery Pool.

Each Holder of an Allowed Guaranty Claim shall promptly provide the Plan Administrator with a written accounting of all proceeds, payments, distributions, credits, and other value received or realized from the Primary Recovery Sources and shall supplement such accounting upon receipt of any additional recovery. Any recovery received after determination of the Remaining Guaranty Claim shall reduce the Remaining Guaranty Claim and shall be credited against future distributions under the Plan. To the extent the Holder's aggregate recoveries from the Liquidating Debtor and all Primary Recovery Sources exceed the Allowed amount of its Guaranty Claim, the Holder shall promptly return such excess to the Liquidating Debtor for inclusion in the Residual Recovery Pool.

### 4.4. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's or Liquidating Debtor's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### 4.5. Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 4.6. Voting Classes; Presumed Acceptance by Non-Voting Classes.

If a Class of Claims or Equity Interests is eligible to vote and no Holder of Claims or Equity Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

## V. PROVISIONS FOR IMPLEMENTATION OF THE PLAN

**5.1. Liquidating Debtor.**

On and after the Effective Date, the Liquidating Debtor shall continue in existence for sole purpose of (a) liquidating the Debtor's assets, including the Downstream Entities and Downstream Assets, and winding down the Debtor's business and affairs consistent with the Debtor's corporate charter and the orders entered in the Maryland Litigation (which, with respect to the Non-Plan Debtors, shall be subject to the oversight and approval of the Bankruptcy Court in the Chapter 11 Cases), (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) in the Plan Administrator's sole discretion, establishing and funding appropriate distribution reserve accounts, (e) in the Plan Administrator's sole discretion, investigating, prosecuting, and resolving the Causes of Action, (f) filing appropriate tax returns, and (g) administering the Plan in an efficacious manner.

**5.2. Sources of Consideration for Plan Distributions**

The Liquidating Debtor will fund distributions under the Plan with (i) Cash on hand on the Effective Date; (ii) the Exit Facility; (iii) proceeds from the sale of the North Freeway Property; (iv) the Residual Proceeds; and (v) the proceeds of Causes of Action.

**5.3. Vesting of Assets in Liquidating Debtor**

Except as otherwise provided herein, on the Effective Date, the assets of the Debtor shall vest in the Liquidating Debtor free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided for in the Plan, the Liquidating Debtor may operate its business and use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**5.4. Termination of Existing Officers and Directors**

On the Effective Date, without the necessity of any resignation, notice, corporate action, or other further act, each Person then serving as a trustee, director, manager, officer, authorized representative, or other member of management of the Debtor shall be deemed removed and terminated from each such position, and all authority of each such Person to act for, represent, manage, control, direct, or bind the Debtor or the Estate shall immediately cease and be of no further force or effect. From and after the Effective Date, the Plan Administrator shall have exclusive authority to manage the affairs of, exercise all governance and decision-making authority over, and act for and bind the Liquidating Debtor and the Estate, including exercising the Liquidating Debtor's rights with respect to its direct and indirect subsidiaries. Notwithstanding the foregoing, each former trustee, director, manager, and officer shall remain subject to any obligations under the Plan or Confirmation Order to preserve and deliver books and records, provide information, cooperate with the Plan Administrator, or perform any authority expressly delegated in writing by the Plan Administrator.

**5.5. Appointment of the Plan Administrator**

On the Effective Date, without the necessity of any resignation, notice, vote, consent, or other action, the authority, power, and incumbency of each Person then serving as a trustee or officer of the Debtor shall terminate, and the Plan Administrator shall be appointed as the sole trustee and authorized representative of the Liquidating Debtor. The Plan Administrator shall succeed to and may exercise all rights, powers, functions, and authority of the Debtor's board of trustees, trustees, and officers under the Debtor's declaration of trust, bylaws, other governing documents, applicable law, the Plan, and the Confirmation Order.

The Plan Administrator shall act as a fiduciary for the benefit of Holders entitled to distributions under the Plan and shall have all authority necessary or appropriate to administer, wind down, and dissolve the Liquidating Debtor and to exercise the Liquidating Debtor's rights with respect to the Downstream Entities. The Confirmation Order shall constitute all authorization and approval required for the appointment of the Plan Administrator and the exercise of such authority. To the extent necessary to implement the Plan, the Debtor's declaration of trust, bylaws, and other governing documents shall be deemed amended as of the Effective Date to provide for the governance of the Liquidating Debtor by the Plan Administrator, without further action by any trustee, officer, or Holder of an Equity Interest; provided that the Plan Administrator may execute and file any certificate, amendment, or other instrument that the Plan Administrator determines is necessary or appropriate to evidence or implement such amendment.

**5.6. Powers and Authority of the Plan Administrator**

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Liquidating Debtor. The Plan Administrator may exercise every governance, voting, consent, management, removal, appointment, and other ownership right held by the Liquidating Debtor as member, shareholder, limited partner, general partner, or owner of any direct or indirect subsidiary of the Liquidating Debtor, including the Downstream Entities.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Liquidating Debtor; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) making distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Liquidating Debtor; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Liquidating Debtor; (7) administering and paying taxes of the Liquidating Debtor, including filing tax returns; (8) representing the interests of the Liquidating Debtor before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

**5.7. Liquidation of Downstream Entities and Downstream Assets.**

The Plan Administrator shall cause the Downstream Entities to continue operations only to the extent necessary to preserve value, market and sell Downstream Assets, refinance or repay debt

of the Downstream Entities, and distribute net proceeds upstream as and when legally permissible. Nothing in this Plan shall be deemed to vest Downstream Assets in the Liquidating Debtor, authorize the sale of nondebtor property under section 363 of the Bankruptcy Code, impair any interest in or claim against a Downstream Entity or Downstream Asset, or otherwise alter a nondebtor entity's obligations except as expressly authorized under applicable nonbankruptcy law.

To effectuate the liquidation of the assets of the Liquidating Debtor as contemplated by this Plan, the Plan Administrator shall oversee the liquidation of the Downstream Entities and Downstream Assets. The Plan Administrator shall implement commercially reasonable marketing and sale procedures, including, as appropriate, retention of a qualified broker, market exposure designed to obtain the highest reasonably available value, documentation of material bids and negotiations, and periodic reporting to the Oversight Committee.

Sale proceeds generated by a Downstream Entity shall first be applied to such entities' debt, creditors, transaction expenses, and reasonable reserves. Only legally available net proceeds may be distributed upstream and, in the Liquidating Debtor's possession, shall be Residual Proceeds.

**5.8. Compensation and Reimbursement of the Plan Administrator**

The Plan Administrator shall be entitled to receive compensation and reimbursement of actual and reasonable expenses in accordance with the Plan Administrator Agreement. The compensation and expenses of the Plan Administrator shall constitute costs and expenses of administering and implementing the Plan, shall be paid by the Liquidating Debtor in the ordinary course from available Cash, and shall not require further notice to or approval of the Bankruptcy Court under sections 327, 328, 330, or 331 of the Bankruptcy Code. The Liquidating Debtor shall maintain reasonable reserves for such compensation and expenses before making distributions from the Residual Recovery Pool or the Equity Distribution Pool.

**5.9. Appointment of the Oversight Committee**

On the Effective Date, the Oversight Committee shall be established. The Plan Administrator shall consult with the Oversight Committee before entering an affiliate or insider transaction, selling a material Downstream Asset, or settling a material Cause of Action. The Plan Administrator shall provide the Oversight Committee with periodic reports as reasonably practicable, and no less often than quarterly.

**5.10. Resignation of the Plan Administrator**

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Oversight Committee; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator by majority vote of the then-members of the Oversight Committee. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the Plan Administrator relating to the Liquidating Debtor shall terminate. In the event the Oversight Committee is unwilling or unable

to identify or agree upon a successor Plan Administrator, the Bankruptcy Court shall have the authority to make such appointment.

**5.11. Dissolution of the Debtor**

The Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Liquidating Debtor, and the filing by the Plan Administrator a certificate of dissolution or similar document shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, trustees, board of directors, or board of managers of the Debtor.

**5.12. Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtor before, on, or after the Effective Date involving the corporate structure of the Debtor or the Liquidating Debtor, and any corporate action required by the Debtor in connection with the Plan or corporate structure of the Debtor, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the Holders of Equity Interest, directors, managers, or officers of the Debtor. Before the Effective Date, the appropriate officers of the Debtor, and on or after the Effective Date, the Plan Administrator on behalf of the Liquidating Debtor, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtor or Liquidating Debtor, as applicable. The authorizations and approvals contemplated by this section shall be effective notwithstanding any requirements under applicable non-bankruptcy law. For purposes of this Section and all other provisions of the Plan, references to corporate or organizational action shall include any action that otherwise would be required to be taken by the Debtor's board of trustees, individual trustees, officers, or shareholders under the Debtor's declaration of trust, bylaws, other governing documents, or applicable law.

**5.13. Effectuating Documents; Further Transactions**

Prior to the Effective Date, the Debtor is, and on and after the Effective Date, the Plan Administrator and Liquidating Debtor are, authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

**5.14. Preservation of Causes of Action**

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, shall vest in the Liquidating

Debtor and be enforceable by the Plan Administrator pursuant to the terms of the Plan. Except for any Cause of Action against an Entity that is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Liquidating Debtor or the Plan Administrator will not pursue any and all available Causes of Action against them. The Liquidating Debtor and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Plan Administrator reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

**5.15. Preservation and Turnover of Books and Records.**

Upon entry of the Confirmation Order, and continuing through and after the Effective Date, each of the Debtor's existing trustees, directors, officers, managers, employees, and other authorized representatives (collectively, the "Existing Management") shall preserve and shall not destroy, alter, conceal, remove, or dispose of any books, records, documents, communications, electronically stored information, devices, files, accounts, access credentials, or other information of or relating to the Debtor that is within such Person's possession, custody, or control. On the Effective Date, or at such earlier or later time as the Plan Administrator may reasonably request, Existing Management shall promptly deliver or provide to the Plan Administrator all such materials and information, including originals and native electronic files, together with all passwords, access credentials, encryption keys, and other information reasonably necessary to obtain access thereto. Existing Management shall reasonably cooperate with the Plan Administrator in identifying, locating, accessing, interpreting, and transferring the Debtor's books and records, notwithstanding the termination of their positions or authority on the Effective Date.

**5.16. Securities Laws Matters**

Notwithstanding anything to the contrary in the Plan, the Plan does not provide for or contemplate the issuance of any securities. No new securities of any kind, including common stock, preferred stock, options, warrants, rights, certificates, liquidation interests, or other securities, shall be issued, transferred, or distributed under or in connection with the Plan, and no issuance under section 1145 of the Bankruptcy Code is contemplated or authorized. Any rights under the Plan, including any right to receive a liquidating or wind-down distribution on account of an Allowed Claim, are rights solely under the Plan, are not securities, and are non-transferable except by will, intestacy, or operation of law.

As of the close of business on the Distribution Record Date, and in any event no later than the Effective Date, the Debtor's stock transfer ledgers, stock transfer books, and other ownership records shall be closed, and no further transfers of any Equity Interest or other equity security of the Debtor shall be recorded. The Plan Administrator shall be authorized to disregard and not recognize any purported transfer after such time.

The Plan Administrator is authorized, in his sole discretion and without further corporate action, to take all other actions necessary or appropriate to terminate the registration of the Debtor's securities and suspend the Debtor's reporting obligations under the Securities Exchange Act of 1934, including ceasing to file periodic reports, in each case to the extent permitted by applicable law.

All actions contemplated by this Section, including the cancellation and extinguishment of Equity Interests, the closing of the stock transfer books and ledgers, and the related securities-law filings, are authorized and approved under applicable Maryland law and the Debtor's governing documents and shall be deemed to have been taken without further action by any shareholder, director, trustee, officer, or other Entity. No further shareholder or director action shall be required to implement this Section.

### 5.17. Exemption from Certain Taxes and Fees.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under this Plan, including any issuance, transfer or exchange of any security, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

### 5.18. Retiree Benefits.

Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law for the duration of the period during which the Debtor is obligated to provide such benefits.

## VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.1. Assumption of Executory Contracts and Unexpired Leases.

On the Effective Date, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### 6.2. Cure of Defaults and Objections to Cure and Assumption.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, the Liquidating Debtor shall pay Cure Claims on the Effective Date or as soon as practicable thereafter. All objections to assumption or requests for payment of Cure Claims that differ from the amounts identified in the Cure Notice must be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing. Any such objection or request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Liquidating Debtor, without the need for any objection by the Plan Administrator or any further notice to or action, order, or approval of the Bankruptcy Court.

If there is a dispute regarding the assumption of an Unexpired Lease or Executory Contract or the payment of a Cure Claim, then such assumption and/or payment shall occur as soon as practicable after entry of a Final Order resolving such dispute, approving such assumption, or as may be agreed upon by the Liquidating Debtor and the counterparty to the Executory Contract or Unexpired Lease. The Plan Administrator may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. The Liquidating Debtor reserves the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 30 days after a Final Order resolving an objection to assumption or determining the Cure Claim or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed shall be deemed satisfied as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

### 6.3. Rejection Damages Claims and Objections to Rejections.

Pursuant to section 502(g) of the Bankruptcy Code, counterparties to Executory Contracts or Unexpired Leases that are rejected shall have the right to assert Claims, if any, on account of the rejection of such contracts and leases. Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of Executory Contracts and Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court no later than 30 days after the later of the Confirmation Date or the effective date of rejection. Any such Proofs of Claim that are not timely filed shall be disallowed without the need for any further notice to or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as Class 6 General Unsecured Claims.

**6.4. Reservation of Rights.**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Liquidating Debtor shall have 30 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## VII. DISTRIBUTIONS

**7.1. Distributions on Account of Claims and Equity Interests**

Subject to the terms, priorities, and distribution waterfall set forth in the Plan, the Plan Administrator shall have sole discretion to determine the timing, amount, and frequency of interim, supplemental, and final distributions under the Plan. In exercising such discretion, the Plan Administrator may retain Cash and establish, adjust, or release such reserves as the Plan Administrator determines are reasonably necessary for Disputed Claims, costs and expenses, contingent or unliquidated liabilities, taxes, and the administration and implementation of the Plan. No Holder of a Claim shall have any right to compel a distribution before the Plan Administrator determines that sufficient Cash is available and that such distribution is appropriate under the Plan.

**7.2. Special Rules for Distributions to Holders of Disputed Claims and Interests.**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Equity Interest until all such disputes in connection with such Disputed Claim or Equity Interest have been resolved by settlement or Final Order.

**7.3. Delivery of Distributions.**

**a. Record Date for Distributions**

On the Distribution Record Date, the claims register shall be closed and the Plan Administrator shall be authorized and entitled to recognize only those record Holders, if any, listed on the claims register as of the close of business on the Distribution Record Date.

**b. Distribution Process**

The Plan Administrator shall make all distributions required under the Plan. Distributions to Holders of Allowed Claims and Equity Interests, including Claims and Equity Interests that become Allowed after the Distribution Record Date, shall be made to Holders of record as of the Distribution Record Date: (1) to the address of such Holder as set forth in the books and records of the Debtor; (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtor's books and records, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is 14 days before the Effective Date; or (3) to any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. The Plan Administrator shall not incur any liability whatsoever on account of any distributions under the Plan.

**c. Compliance Matters**

In connection with the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

**d. Undeliverable and Unclaimed Distributions**

If any distribution to a Holder of an Allowed Claim or Equity Interest is returned to a Plan Administrator as undeliverable, no further distributions shall be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then-current address or other necessary information for delivery. Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and be treated as Residual Proceeds under the Plan. Upon such revesting, the Claim or Equity Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandonment, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

**7.4. Claims Paid or Payable by Third Parties.**

**a. Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account

of such Claim from a party that is not the Liquidating Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party other than the Liquidating Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Liquidating Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

**b. Claims Paid by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's or Downstream Entities' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtor's or Downstream Entities' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be disallowed to the extent of any agreed upon satisfaction without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**c. Applicability of Insurance Policies**

Except as otherwise provided herein, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**7.5. Setoffs.**

Except as otherwise expressly provided for herein, the Liquidating Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Liquidating Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Liquidating Debtor of any such Claims, rights, and Causes of Action that the Liquidating Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Liquidating Debtor unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

## VIII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

### 8.1. Prosecution of Objections to Claims and Equity Interests.

The Plan Administrator and the Plan Proponents shall have the sole right to object to any Claim or Equity Interest. Any objections to Claims and Equity Interests shall be served and filed on or before the Claims Objection Deadline. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Liquidating Debtor shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Equity Interest, including any Causes of Action against the Holder of such Disputed Claim or Equity Interest, and such rights and defenses may be exercised by the Plan Administrator.

### 8.2. Disallowance.

All Claims and Equity Interests of any Entity from which property is sought by the Liquidating Debtor under section 542, 543, 550, or 553 of the Bankruptcy Code or that Liquidating Debtor alleges is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Liquidating Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## IX. EFFECT OF CONFIRMATION OF THE PLAN

### 9.1. General Settlement of Claims.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtor and the Estate.

### 9.2. No Discharge; Treatment of Claims and Interests.

Consistent with section 1141(d)(3) of the Bankruptcy Code, Confirmation of the Plan shall not discharge the Debtor or the Liquidating Debtor from any Claim. Notwithstanding the absence of a discharge, pursuant to section 1141(a) of the Bankruptcy Code, from and after the Effective Date, the rights of each Holder of a Claim against or Equity Interest in the Debtor, the Liquidating Debtor, or property of the Estate shall be governed exclusively by the Plan and the Confirmation

Order, and each such Holder shall be entitled to receive only the distributions and other treatment provided under the Plan on account of such Claim or Equity Interest.

Except as otherwise expressly provided in the Plan or the Confirmation Order, no Holder of a Claim or Equity Interest may, on account of such Claim or Equity Interest, seek or receive any payment or other distribution from, or commence or continue any action or proceeding against, the Debtor, the Liquidating Debtor, the Estate, or property distributed or retained pursuant to the Plan, other than to enforce the rights provided to such Holder under the Plan or the Confirmation Order. Nothing in this Section shall release or otherwise affect the liability of any nondebtor Entity or any property of a nondebtor Entity, except to the extent expressly provided in the Plan or the Confirmation Order and permitted by applicable law.

**9.3. Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**9.4. Release of Liens.**

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Debtor and its successors and assigns.

**9.5. Injunction.**

**Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Liquidating Debtor: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right**

**in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

**9.6. Reimbursement or Contribution.**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**10.1. Conditions Precedent.**

The occurrence of the Effective Date shall be subject to satisfaction or waiver, in accordance with Section 10.2 of the Plan, of each of the following conditions:

(a) the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Plan Proponents, and the Confirmation Order shall be in full force and effect and shall not be subject to any stay then in effect;

(b) the Confirmation Order shall authorize and approve all actions, transactions, agreements, and documents necessary or appropriate to implement the Plan, including the appointment of the Plan Administrator, the termination of Existing Management, the cancellation of the Equity Interests, the Exit Facility, and the Liens granted in connection with the Exit Facility;

(c) the Plan Supplement and all documents required to be included therein shall have been Filed and shall be in form and substance acceptable to the Plan Proponents;

(d) the Plan Administrator shall have accepted the appointment as Plan Administrator, and the initial members of the Oversight Committee shall have been identified and agreed to serve;

(e) the Exit Facility Loan Documents shall have been executed and delivered, all conditions precedent to funding under the Exit Facility Loan Documents shall have been satisfied or waived by the Exit Lender, and the proceeds of the Exit Facility shall have been funded or shall be available to be funded concurrently with the occurrence of the Effective Date;

(f) sufficient Cash shall be available to make all payments required to be made on the Effective Date and to establish all reserves required under the Plan;

(g) all material documents and instruments necessary to implement the Plan shall have been executed or shall be subject only to the occurrence of the Effective Date, and all material actions necessary to implement the Plan shall have been taken; and

(h) no applicable law, order, judgment, injunction, or other decree shall restrain or prohibit the implementation or consummation of the Plan.

**10.2. Waiver of Conditions Precedent.**

Except for the condition set forth in Section 10.1(a), the Plan Proponents may waive any condition precedent to the Effective Date at any time, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; provided that any condition arising under or relating to the Exit Facility Loan Documents may be waived only with the consent of the Exit Lender. The waiver of any condition precedent shall not constitute or be deemed a waiver of any other condition precedent.

**10.3. Occurrence of the Effective Date.**

Upon satisfaction or waiver of all conditions precedent to the Effective Date, the Plan Proponents shall File the Notice of Effective Date. The Effective Date shall occur on the date identified in the Notice of Effective Date without the necessity of any further notice, action, order, or approval of the Bankruptcy Court or any other Entity.

**10.4. Effect of Non-Occurrence of Conditions Precedent.**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Equity Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtor or any other Entity.

## XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**11.1. Plan Modification.**

Effective as of the date hereof: (a) the Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order (and before the Effective Date), the Plan Proponents may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**11.2. Plan Revocation or Withdrawal.**

The Plan Proponents reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall constitute a waiver or release of any Claims, Equity Interests, or Causes of Action or prejudice in any manner the rights of any Entity.

## XII. JURISDICTION

### 12.1. Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the maximum extent permitted by applicable law, over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including specifically jurisdiction to:

(a) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Claim or Equity Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(b) decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c) resolve any matters related to Executory Contracts or Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d) ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e) adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters;

(f) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan or the Confirmation Order, including contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

(g) enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(h) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

(i) hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases;

(j) enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(k) consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(l) hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m) enter an order or final decree concluding or closing the Case; enforce all orders previously entered by the Bankruptcy Court; and hear any other matter not inconsistent with the Bankruptcy Code.

**12.2. Abstention of Jurisdiction.** Nothing herein shall affect the right of the Liquidating Debtor's to assert Causes of Action or otherwise seek any appropriate relief in any court of competent jurisdiction. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to these Cases, this ARTICLE XII of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## XIII. MISCELLANEOUS

### 13.1. Reservation of Rights.

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Plan Proponents with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Plan Proponent prior to the Effective Date.

### 13.2. Entire Agreement.

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 13.3. Plan Supplement Exhibits.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.

**13.4. Non-Severability.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Plan Proponents' consent; and (c) nonseverable and mutually dependent.

## XIV. CRAMDOWN REQUEST

The Plan Proponents hereby request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims and Interests. The Plan Proponents reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

[*signature page follows*]

Dated: October [___], 2026

*/s/ Allen Hartman*
Allen Hartman, Individually and on behalf of
Hartman vREIT XXI, Inc., Plan Proponents